```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    -------------------------------------x
 3  RICHTONE DESIGN GROUP LLC,

 4                          Plaintiff,

 5                                  22 CV 1606(KMK)(AEK)
         -vs-
 6                                  DISCOVERY CONFERENCE
    MARY SULLIVAN KELLY and TRUE
 7  PILATES BOSTON LLC,

 8                          Defendants.

 9  -------------------------------------x

10                              United States Courthouse
                                White Plains, New York
11
                                December 6, 2022
12
    B e f o r e:   THE HONORABLE ANDREW E. KRAUSE,
13                 United States Magistrate Judge


14
    APPEARANCES:
15
    ROMEO JULIUS SALTA
16       Attorneys for Plaintiff
         630 Ninth Avenue, Suite 405
17       New York, New York 10036
    BY: Romeo Salta  (Of counsel to KNULL, P.C.)
18

19  GORDON E.R. TROY, P.C.
         Attorneys for Defendants
20       183 Highfield Drive
         P.O. Box 67
21       Windsor, Vermont 05089
    BY: GORDON E.R. TROY
22

23


24

25  *Proceedings recorded via digital recording device*
```

1          THE DEPUTY CLERK:  Good morning, all.  This is the

2   matter of Richtone Design Group LLC versus Kelly, et al., Docket

3   No. 22-cv-1606, the Honorable Andrew Krause presiding.

4          Counsel, please note your appearance for the record,

5   starting with plaintiff's counsel.

6          MR. SALTA:  Romeo Salta, of counsel to Knull P.C.

7   Good morning, Judge.

8          THE COURT:  Good morning, Mr. Salta.

9          MR. TROY:  Good morning, Your Honor.  Gordon Troy

10  representing the defendants, and I have to make a note is, is

11  please accept my apologies for giving you an extra "S" to your

12  name in my earlier filings.

13         THE COURT:  And dropping the "E," too.

14         MR. TROY:  Yes, it was totally erroneous.  Please

15  accept my apologies.

16         THE COURT:  Apology is accepted.  That is a common

17  misspelling of my name, so apology accepted.  Thank you.

18         MR. TROY:  It could be also because an "E" and an "S"

19  on the screen look very similar to each other.

20         THE COURT:  Okay.  Well, whatever it is, it is a

21  common misspelling, so all right.  Now we know.

22         MR. TROY:  It's a little embarrassing.

23         THE COURT:  That's okay.  There are worse things that

24  have happened in the world, so but I appreciate it, Mr. Troy.

25  All right.

 1          We have a long agenda to go through today, and so I
 2   want to start off by making sure I have a clear understanding of
 3   exactly where things are in this case based on your last
 4   conference with Judge Karas.  In the agenda filing that was
 5   submitted by Mr. Troy at ECF No. 44 there was a brief recap.  I
 6   just want to make sure we are all on the same page about that.

 7          At our last conference, of course, we talked at some
 8   length about the possibility of plaintiffs filing a motion to
 9   dismiss the defendants' third counterclaim, and just for the
10   record to be clear, I am going to probably refer to you as
11   "plaintiffs" and "defendants;" plaintiffs being Mr. Gallagher
12   and Richtone, defendants being the defendants on the original
13   complaint.  I understand there are counterclaims, and
14   Mr. Gallagher is not actually technically a plaintiff, but I
15   think we will all understand who I am referring to, and just to
16   make it a little bit less cumbersome, that's what we will do
17   going forward.

18          There was going to be a motion to dismiss the third
19   counterclaim.  As part of the submissions back and forth about
20   that, the defendants indicated an interest in filing a motion
21   for summary judgment or partial summary judgment as to certain
22   affirmative defenses, counterclaims, and at least one of the
23   plaintiff's claims.  There was back-and-forth about whether
24   there should be a stay of discovery.  Various orders were issued
25   about that.  I understand that Judge Karas held a pre-motion

1  conference last week on the 29th.  In a minute entry of that

2  conference, and then as reflected in Mr. Troy's letter on

3  December 1st, the discovery stay, which was temporarily put in

4  place at ECF No. 35, was lifted.  We have then a deadline for

5  completion of all discovery of January 31st, but there's been

6  some discussion about potentially deferring the inspection of

7  photographs and negatives, which we spent a lot of time talking

8  about at our last conference, until after that discovery

9  deadline and potentially until after the resolution of some of

10  these motions.

11         So that's what I understand to be the current state of

12  affairs based on my review of the docket and the various

13  filings.

14         Mr. Salta, anything you want to just clarify for me or

15  add to that summary?

16         MR. SALTA:  Well, just maybe for purposes of

17  clarification, it's not that the plaintiff is waiving his right

18  to bring a motion to dismiss on standing grounds with regard to

19  the third counterclaim; it's just that after our conference with

20  Judge Karas, it was agreed -- Mr. Knull was present representing

21  the plaintiff -- it was agreed that there would be one motion

22  after discovery to address all the issues.

23         THE COURT:  Okay.  I didn't actually realize that.

24  That wasn't clear.  So that's new information.  So motion

25  practice is going to be deferred.

 1          MR. SALTA:  That's right.  Judge Karas suggested we do

 2    that to maybe expedite things, and so it's not a waiver, in

 3    other words.

 4          THE COURT:  No.  That's fine.  I understand that.  I

 5    think that was my suggestion, too, but --

 6          MR. SALTA:  Yeah.  Fine.

 7          THE COURT:  Okay.  So be it.  Okay.

 8          MR. TROY:  And Your Honor, just to supplement that.

 9          THE COURT:  Yes.

10          MR. TROY:  It was all fact discovery by January 31st

11    and deferring what we call the expert, which is to be able to

12    review the negatives that we had spent a copious amount of time

13    last time we were together.

14          THE COURT:  Okay.  That is particularly germane to our

15    discussion today.  The original text order that Judge Karas

16    issued on this didn't distinguish between fact and expert

17    discovery in terms of the January 31st deadline, and I went back

18    to the original scheduling order, which is at ECF No. 17, which

19    had the same deadline for completion of fact and expert

20    discovery, essentially.  Actually, the fact discovery deadline

21    was a couple of weeks later than the expert discovery deadline,

22    which is unusual.  But this is the type of schedule that is

23    often put in place when the parties are not anticipating any

24    expert discovery.

25          So as I understand the potential scope of expert

1  discovery here, we are likely to have expert discovery in

2  connection with this inspection of the photographs and

3  negatives.  There had been some discussion at some point about

4  maybe having some sort of legal expert on the Copyright Act of

5  1900 or whatever that exact statute was.  Forgive me.

6          MR. TROY:  1909.

7          THE COURT:  1909.  Thank you.  But was there specific

8  discussion with Judge Karas about the expert discovery and

9  deferring that until after motion practice?

10         MR. TROY:  Yes, Your Honor.

11         THE COURT:  So.

12         MR. TROY:  I'm sorry.  If I may add to that, the

13 discussion centered around that if we are successful, which I

14 hope I am, in our motion practice, then there will be no need --

15         THE COURT:  It obviates the need for the expert

16 discovery.  We do this all the time in other kinds of cases,

17 personal injury cases and the like, where money can be saved if

18 there's going to be summary judgment on some sort of liability

19 issue with experts that mostly pertain to damages, that's fine.

20 I just wanted to make sure that everybody has a common

21 understanding of that.

22         Mr. Salta, that's your understanding as well?

23         MR. SALTA:  That is my understanding.  Well, I guess

24 we will get to -- we'll get to the specifics when we get rolling

25 on these objections of the defendants.  It's our feeling that a

1  lot of the issues -- I don't know which would be better, to have

2  the expert discovery ahead of time, which would obviate the need

3  for burdensome discovery responses on our part?  Because, quite

4  frankly, a lot of these demands necessitate going through old

5  negatives and having, I suppose, experts of our own trying to

6  figure out how to respond to some of these demands.  Old

7  negatives, did you have this?  Do you have that?  I mean, the

8  point is if they did the expert discovery, it would answer most

9  of the questions that they have problems with in fact discovery,

10  I believe.

11          THE COURT:  How, though?  I mean --

12          MR. SALTA:  Well, a lot --

13          THE COURT:  I mean, we will get into this I guess when

14  we get into the details of some of the fact disputes, but if a

15  question is:  Did you receive this negative or photograph from a

16  particular person at a particular time, how is an expert going

17  to help figure that out?

18          MR. SALTA:  Not that particular question.

19          THE COURT:  Okay.  Others.

20          MR. SALTA:  Was this in your possession at the time,

21  blah, blah, blah?  What was in your possession?  What was not in

22  your possession at the time?

23          THE COURT:  But how is that -- okay.  When we get to

24  those questions that you think can be better answered by an

25  expert as opposed to by Mr. Gallagher or someone affiliated with

1 the plaintiffs, you can point those out to me, and then we can

2 talk about what makes sense.

3          And obviously, Mr. Troy, if you have a different view

4 of any of those things, you can share it at that time.

5          I am not exactly sure what you are talking about,

6 Mr. Salta, but you will tell me when we get there.

7          MR. SALTA:  Okay.  Fair enough.

8          THE COURT:  Okay.  So before we leave today, let's

9 make sure that we have an answer to this question about when

10 expert discovery should take place.  My understanding is, as of

11 now, the schedule is all fact discovery to be completed by

12 January 31st; expert discovery deferred until sometime after

13 motion practice if it's still warranted.  I gather Mr. Salta may

14 have some ideas about how to do that differently.  We will talk

15 about that once we have a sense of what the discovery landscape

16 is going to be.

17          All right.  There are a couple of stray issues in

18 order to sort of try to make some incremental progress before we

19 dive into the more complicated ones.  Let me just review those

20 as I spotted them in the various filings.

21          There was some discussion about a deposition of a John

22 Steel, who is a California resident, but who is going to be

23 traveling to New York City this week.  I believe this was

24 something that you had raised in one of your letters, Mr. Troy?

25          MR. TROY:  Your Honor, there -- that is still going

1  forward, but there is a slight change because there's sickness

2  in his family, and he is not traveling to New York.  So he has

3  asked for a remote deposition.  I've circulated to plaintiff's

4  counsel yesterday, you know, the basic list of, you know, you

5  know, the protocol, if you will, of how to conduct a remote

6  deposition.  We've already engaged a remote deposition company

7  to be able to do that for us, and if you want me to go through

8  that list, I don't have it printed out, but I --

9            THE COURT:  No.  I mean, unless --

10           MR. TROY:  We have used it, this same list in numerous

11  other cases.

12           THE COURT:  Meaning just the mechanics of how you are

13  going to go about it?

14           MR. TROY:  Yes.

15           THE COURT:  Sharing exhibits and whatnot?

16           MR. TROY:  Yeah, we're going to share them on the

17  screen; that the witnesses, they are not going to have any other

18  props available, no other documents.  Nobody is going to talk to

19  the witness during the deposition.

20           THE COURT:  Right.  Is the witness going to be

21  represented by counsel?

22           MR. TROY:  No.

23           THE COURT:  Okay.  Fine.  So that's going forward.

24           Mr. Salta, any concerns about that?

25           MR. SALTA:  My only concern, and I spoke to Mr. Troy

1  briefly a few minutes ago, is whether or not Mr. Knull can be

2  present for that, and -- he's going through some medical

3  procedures right now.

4            THE COURT:  Okay.

5            MR. SALTA:  And I will let Mr. Troy know later today.

6  I will try to reach Mr. Knull.  It's -- what he is going through

7  is a bit debilitating.

8            THE COURT:  Okay.  I'm sorry to hear that.

9            MR. SALTA:  Yes.

10           THE COURT:  And if Mr. Knull is not able to

11  participate, are you able to participate?

12           MR. SALTA:  I will try to be, but I know that it would

13  be better if Mr. Knull is available, but if need be, I will

14  participate.

15           THE COURT:  Okay.  I mean, the other thing is that if

16  -- the whole point of conducting a deposition this week was that

17  Mr. Steel was going to be here.  If it's going to be taking

18  place remotely, and there is some flexibility in Mr. Steel's

19  schedule within the timeframe allowed by the discovery and

20  potentially to accommodate Mr. Knull, then I will encourage you

21  to work that out.  I mean, again, the urgency to do it this week

22  was it was an opportunity to catch Mr. Steel while he was in

23  town.  But in any event, I will leave you to discuss that.

24  Obviously, it would be best if a representative from plaintiff's

25  side could be present for the deposition.

1          MR. TROY:  Absolutely, Your Honor.  And all I can say

2    is, is this that Mr. Steel basically said to us, that's the date

3    that I blocked out for doing it, and let's just make that

4    happen.

5          THE COURT:  Right.  This is a non-party witness.  You

6    want to be accommodating to his schedule.  So --

7          MR. TROY:  Overly accommodating.

8          THE COURT:  Okay.  Who is Mr. Steel, very briefly?

9          MR. TROY:  Mr. Steel was the attorney who represented

10   Clara Pilates in the original transaction from Clara Pilates to

11   939 Studio.

12         THE COURT:  That's enough.  That's okay.

13         MR. TROY:  In 1970.

14         THE COURT:  He has a connection to this case that

15   dates way back.

16         MR. TROY:  And he's old and frail.

17         THE COURT:  Okay.  Well, fine.  So that's the status

18   there.  There was some discussion or some request in one of your

19   submissions, Mr. Troy, about amending your answer to include a

20   defense of collateral estoppel?  I don't really want to get into

21   that in great detail.  It sounded like that was something you

22   were going to address with Judge Karas.  Was that discussed?

23         MR. TROY:  We actually never got to that point with

24   Judge Karas.  My only concern -- I mean, we are of record that

25   that's -- that if plaintiff goes down that path, that is a

1  defense, and we would amend the pleadings accordingly, but, you

2  know, I think it's sufficiently of record at this point that I

3  prefer not to file an amended answer and counterclaims.

4          THE COURT:  Okay.

5          MR. TROY:  Just seems like an unnecessary exercise on

6  our part and on the plaintiff's part.

7          THE COURT:  And plaintiffs seem to suggest it was an

8  unnecessary exercise because, at least reading between the

9  lines, it didn't sound like they were intending to raise any

10 issues that would require that as a defense.

11         But, Mr. Salta, I trust that there is not going to be

12 some argument down the line that if you raise whatever this

13 argument is about trademark or about the --

14         MR. SALTA:  Goodwill.

15         THE COURT:  -- goodwill and how that may or may not

16 apply in the copyright context, that the defendants are going to

17 be precluded from raising a collateral estoppel defense because

18 they haven't amended their answer?

19         MR. SALTA:  The problem that we had with the whole

20 collateral estoppel issue is these are different parties.  It

21 wasn't a copyright case.

22         THE COURT:  That's a substantive problem that you have

23 with --

24         MR. SALTA:  Exactly.  I mean, so --

25         THE COURT:  I am just asking as a procedural matter.

1           MR. SALTA:  Procedurally, if they want to put it as an

2   affirmative defense that might not go anywhere, fine.

3           THE COURT:  Or I think Mr. Troy would prefer to just

4   not bother with that because if he has to amend his answer and

5   counterclaim, then you have to file an amended -- just it

6   creates work for everybody and expense.

7           MR. SALTA:  We can work it out.

8           THE COURT:  You are just not going to argue in the

9   future that he is not allowed to say collateral estoppel.

10          MR. SALTA:  Absolutely.  Yeah, yeah.  I see what you

11  are saying.  No.  That's correct.

12          THE COURT:  Okay.  Fine.  I think it makes sense to

13  not spin our wheels --

14          MR. SALTA:  Sure.

15          THE COURT:  -- just to document that, especially since

16  it's now well documented that if there were to be some argument

17  along those lines, that the defendants may raise a collateral

18  estoppel defense --

19          MR. SALTA:  Fine.

20          THE COURT:  -- you think that there is no collateral

21  estoppel.

22          MR. SALTA:  Also fine.

23          THE COURT:  Everyone preserves their rights.  Good.

24          I have a couple other loose ends on my list here.  One

25  had to do with information -- contact information for a witness

1  Wee Tai Hom.  I hope I am pronouncing that correctly.  That's

2  W-E-E, new word, T-A-I, new word, H-O-M.  Apparently, there was

3  some indication at some point in communications about Rule 26

4  disclosures that this particular individual is alive and may be

5  available for questioning.  The defendants have asked for

6  "accurate contact information" for -- is it Mr. Hom?

7            MR. TROY:  Yes.

8            THE COURT:  Mr. Hom, and as I understood it from the

9  letter, which -- this is the point that wasn't specifically

10 addressed anywhere else -- but as I understood it, certain

11 contact information was provided, but it turned out not to be

12 good contact information because Mr. Gallagher hasn't been in

13 touch with this individual in some time.  If this person is a

14 potential witness, and somebody that the plaintiffs may rely on

15 pursuant to Rule 26(a)(1), then obviously, they are obligated to

16 provide accurate contact information to the extent they have it.

17           So did you provide the most current information that

18 you have for this potential witness, Mr. Salta?

19           MR. SALTA:  Yes, sir.

20           THE COURT:  Okay.  I mean, Mr. Troy, I think Mr. Salta

21 acknowledges the obligation to provide that, and the rules are

22 clear, but if he doesn't have anything more than what he's given

23 you, then he can't conjure it.  So I'm not sure what you are

24 requesting exactly.

25           MR. TROY:  I am not -- "conjure" is a perfect word,

1 Your Honor.  My concern is very straightforward, and that is, is

2 that part of the Rule 26 disclosures is to enable the opposite

3 side to be able to decide who they may want to contact in

4 connection with the litigation is is that my fear or concern is

5 is that we go to trial, and the next thing you know, they are

6 bringing in Mr. Hom because they've now engaged in some sort of

7 due diligence to locate him, and I have not had an opportunity

8 to depose him.

9          THE COURT:  Right.  But I mean, you could go engage in

10 some sort of due diligence to locate him as well.  I mean, this

11 is a non-party witness.  So if they have contact information, if

12 the plaintiffs have his contact information, I am hereby

13 directing you to provide the most up-to-date current contact

14 information you have for this potential witness who you have

15 listed as a potential witness in your Rule 26 disclosures if you

16 have it.

17          MR. SALTA:  Sure.

18          THE COURT:  If you don't have it, then you don't have

19 it.  There is nothing more we can do about that.  If it comes to

20 be in your possession, then you have to supplement your Rule 26

21 disclosures accordingly as required by Rule 26(e).  To the

22 extent there is any ambiguity about everybody's obligations, it

23 is now clear that that is required.

24          And again, Mr. Troy, you can try to find this person

25 also.

1          MR. TROY:  We have tried.

2          THE COURT:  Okay.  Fine.  That's fine.  So this

3    happens, though, sometimes that there's a witness who people

4    think will have relevant information, but no one knows where

5    they are, and it is possible that he will be located at some

6    point later on, and whatever remedies might be available at that

7    point on the eve of trial will be discussed at that point if we

8    get to that point.

9          Okay.  So I think that covers the what I will call the

10   odds-and-ends portion of this conference.  Although, I will

11   touch on this issue that has come to light recently with respect

12   to the potential sealing of the document at ECF No. 36-1.  First

13   of all, I don't intend to rule on this issue today for a couple

14   of reasons:  One, the motion was filed last week by the

15   plaintiff's side as directed.  I did specifically say in my

16   order scheduling that briefing -- that if the plaintiff felt the

17   need to have a more expedited briefing schedule, they should

18   request it, and frankly, I would have ordered that because if

19   there was an urgency to potentially have this addressed right

20   away, I would have taken that under advisement.  But that was

21   not requested, so the opposition to that motion was due on

22   December 9th, Friday.

23         Now, Mr. Troy actually filed his opposition last

24   night.  I did have an opportunity to read it this morning,

25   although just briefly, and so I'm prepared to discuss it a

1  little bit, but I am not planning to rule on that issue today.

2          A couple of things that came to mind as I reviewed the

3  various papers on this issue:  First, the plaintiff's motion,

4  while it quotes from my individual practice rules, it quotes

5  from the confidentiality order, it doesn't really engage in any

6  detail what the legal standard for maintaining materials under

7  seal and the presumption of public access that is afforded to

8  those, to all materials, frankly, that are judicial documents

9  and filed with the Court.

10          There are some leading cases on this matter.  A couple

11  of them are cited in Mr. Troy's submission.  Another is a case

12  called *Lugosch*, L-U-G-O-S-C-H, *versus Pyramid Company of*

13  *Onondaga,* 435 F.3d 110, a Second Circuit case from 2006.  That

14  is the case most frequently cited on these issues, although I

15  believe that Mr. Troy's brief cites some more recent Second

16  Circuit law which relies on *Lugosch* for some of those standards.

17  The main thrust of the plaintiff's argument seems to be that

18  because these RFA responses were marked as confidential, that

19  they should therefore be subject to filing under seal.  First of

20  all, there was no confidentiality order in place at the time

21  that those responses were provided, so it's not even clear that

22  they fall within the ambit of the protective order, but even if

23  we were to set that aside and designate them as confidential

24  pursuant to the protective order which is now in place, the law

25  is quite clear that just because something is marked as

1  confidential pursuant to a protective order, even a protective

2  order that has been so ordered by the Court, is not by itself a

3  valid basis to overcome the presumption in favor of public

4  access to judicial documents.  There has to be something more

5  than that.  And in fact, in my confidentiality order, which

6  governs in this case, it specifically says that there is no

7  presumption that information marked as confidential pursuant to

8  the protective order shall be filed with the Court under seal.

9          On top of that, there's an interesting sentence in one

10 of plaintiff's letters in this case at ECF No. 32 where counsel

11 wrote, "As with most copyright-related cases, the documents are

12 generally not confidential as the very issue at hand is

13 publication of some sort, and the copyright office files are

14 themselves not secret."  Which seems to undercut the argument in

15 favor of confidentiality.

16         And on top of that, it was noteworthy to me that

17 Mr. Troy pointed out a number of instances where these images or

18 substantially similar images are available all over the internet

19 and in various public -- publicly accessible locations.  So to

20 put it mildly, I had substantial concerns about the idea that

21 these materials should be maintained under seal.  I normally

22 don't allow for a reply briefing in these types of submissions

23 because I don't think it's necessary, but there are a number of

24 issues raised in the opposition submission, concerns that I have

25 just laid out.  I will give you an opportunity to submit a

1 reply, Mr. Salta, if you want to continue to pursue --

2          MR. SALTA:  I will talk to Mr. Knull about it.  He's

3 the one that made the motion.  If I may, for what it's worth?

4          THE COURT:  Yes, briefly.

5          MR. SALTA:  Can I just make a comment on the whole

6 issue of 36-1?  I read the papers, too.  I read what Mr. Knull

7 wrote and the response from Mr. Troy, but it's not just about

8 pictures.  I just want the Court to be aware.  What -- it's

9 about the discovery responses that are attached to the pictures.

10 These are being made public on a regular basis by the Pilates

11 Transparency product -- Project.  There is a campaign going on

12 to disparage the plaintiff.  Just recently based on information

13 supplied on social media, for example, there is -- I have a

14 comment on one of the posts that says, "Are you aware that it is

15 illegal to claim a copyright if you don't legally have one?

16 It's considered fraud.  You could go to -- after Gallagher for

17 damages."

18          There is a push out there spurred on by the defendants

19 for whatever reason to really, really persecute Mr. Gallagher.

20 Had I written a motion -- the motion rather than Mr. Knull, I

21 would have more -- emphasized more what is happening on social

22 media based on information that's being given to the public; and

23 any idiot, let's face it, on social media, they can run wild

24 with this stuff.  Meanwhile, the plaintiff unfairly is being

25 demonized and defamed.  That is really our concern, more than

1  the pictures.  Yes, it's true a lot of these pictures are in the

2  library anyway.

3         THE COURT:  Right.

4         MR. SALTA:  But it's more the argument I would have

5  made of the information, the responses that are attached to

6  these pictures in the RFAs, for example, that is being

7  disseminated out there.  That is of concern, and I would just

8  finally say, what is the harm?  What is the harm if it were

9  sealed?

10         THE COURT:  That's not the standard.

11         MR. SALTA:  I know it's not the standard.

12         THE COURT:  That's not the --

13         MR. SALTA:  I am just talking equity, Judge.

14         THE COURT:  Okay.  I hear you.  I understand that.  I

15  mean, and that is, frankly, partly why I posed the question

16  through Ms. Danzo as to whether there was an objection to

17  maintaining the materials under seal, just so I could understand

18  what the parties' positions were on that, but -- and the bottom

19  line is that's not the standard, and I -- I will give Mr. Troy

20  an opportunity to respond briefly; but frankly, nothing that you

21  just said, Mr. Salta, while it may be concerning to

22  Mr. Gallagher, and I understand that social media is pernicious,

23  and whether defendants have any connection to that or not is --

24  is a separate question which we are not going to have a mini

25  hearing on here.

1          MR. SALTA:  Okay.  I understand.

2          THE COURT:  But the bottom line is, I don't see in

3    that argument any basis for maintaining anything under seal, and

4    the presumption is in favor of public access, and the burden is

5    on the party seeking to maintain the material under seal to

6    justify why it should be under seal, not why it shouldn't be

7    under seal.

8          So look, I mean, this is a public proceeding.

9    Mr. Gallagher, through Richtone, filed this lawsuit.  I imagine

10   that he suspected that there might be blowback from that, and

11   again, I am not suggesting that anybody should be attacked for

12   anything.  That's not my view at all.  But it is a public

13   proceeding, and various things come along with that.

14         MR. SALTA:  I understand, Judge.

15         THE COURT:  So I will give you an opportunity -- and,

16   Mr. Troy, I will give you a second just to respond for the

17   record -- but, Mr. Salta, I will give you and Mr. Knull an

18   opportunity to respond further by Friday, December 9th, if you

19   want to submit anything in response.

20         MR. SALTA:  I will tell Mr. Knull.

21         THE COURT:  Okay.  And if he needs a few more days

22   because of illness, that's fine.  Any urgency with respect to

23   the sealing is on the plaintiff's side.

24         MR. SALTA:  Right.

25         THE COURT:  So I'm perfectly content to wait another

1  week.  I'm not trying to put him into a difficult position while

2  he is in the middle of a health situation.  So --

3          MR. SALTA:  Yes.

4          THE COURT:  -- I will set the deadline for Friday just

5  because there is obviously an interest in getting this resolved,

6  but I'm more than willing to extend that time by a week or two

7  weeks if Mr. Knull needs more time to respond.

8          MR. SALTA:  Understood.  I appreciate that.  Thank

9  you, Judge.

10         THE COURT:  Okay.  Mr. Troy, briefly if you would like

11 to just make a record in response to what Mr. Salta said, but

12 keep it brief.

13         MR. TROY:  Unlike my normal responses, I will be

14 brief.

15         Thank you very much, Your Honor.  The only reason why

16 we filed last night was because of the hearing today and the

17 December 1st letter from Mr. Salta adding that to the agenda.

18 So basically, I worked over the entire weekend to prepare --

19 prepare that and finalized it last night when I finally got down

20 here to White Plains.  So --

21         THE COURT:  And I appreciate that, but just to be

22 clear, the deadline was the 9th.  I was aware of the deadline,

23 and, you know, you didn't have to do that, but it's fine that

24 you did, and you were going to have to do it anyway, so you got

25 it done a little earlier than you would have had to, but go

1  ahead.

2        MR. TROY:  I have nothing to add other than what I

3  think I made clear in our opposition papers.

4        THE COURT:  Okay.  All right.  So I am going to

5  reserve judgment on that for now, but as you can tell,

6  Mr. Salta, I'm heavily inclined to deny the motion absent some

7  sort of compelling further information provided in reply, but

8  I'm amenable to hearing further argument, so I will reserve

9  decision.

10        MR. SALTA:  Understood.

11        THE COURT:  Okay.  All right.  The main things left

12  for us to discuss are the discovery disputes with respect to the

13  interrogatories and the discovery disputes with respect to the

14  RFAs.

15        Let's start with the RFAs.  I will hear from everybody

16  on all of this, but again, I'm going to give you some of my

17  preliminary thoughts.  First, it's clear that you have not had

18  any meaningful meet-and-confer discussions about these RFA

19  responses.  I'm sure you each have reasons why you think the

20  other one is at fault for why you haven't had meaningful meet-

21  and-confer discussions, but the reality is you just haven't.  I

22  think it's fair to say that it would be helpful for the

23  plaintiffs to have a more concrete -- for future reference -- a

24  more concrete set of ideas as to what the defendants' objections

25  are in advance of a meet-and-confer.  That was part of why Mr.

1   Knull pushed back on a meet-and-confer in the first place.  At

2   the same time, just saying we are not going to meet and confer

3   is not reasonable or appropriate or within the boundaries of

4   Rule 37, which requires the parties to make a good-faith effort

5   to meet and confer.  That just didn't happen here.

6           Now there is a document that sets forth the

7   defendants' particular concerns with the RFA responses, so there

8   very much is a basis for a meet-and-confer discussion, and there

9   would have been a basis for a meet-and-confer discussion in

10  advance of today.  I assume that that has not happened; is that

11  right, Mr. Troy?

12          MR. TROY:  Correct, Your Honor.

13          THE COURT:  Okay.  So we are going to talk about this

14  for a while, but then you are going to have to meet and confer

15  about the issues, and the plaintiffs are going to have to try

16  again with a lot of these RFA responses.  Some of them the

17  defendants are going to have to try again with or withdraw the

18  RFAs because some of them, in my view, are not clear, and the

19  objections along those lines are perfectly valid.  But a lot of

20  the responses are not really consistent with Rule 36 and leave

21  more confusion than clarity with respect to the responses to the

22  Requests for Admission.

23          I recently wrote something on Rule 36 Requests for

24  Admission, and so I'm just going to cover some of that here to

25  provide a background and foundation for our discussion.  Rule 36

1  is not a discovery device.  There's something in one of these

2  letters that suggests there should have been different framing

3  of these questions to better get at facts development, but

4  that's in fact-finding.  That's not what Rule 36 is about.  The

5  purpose of the rule is to reduce the costs of litigation by

6  eliminating the necessity of proving facts that are not in

7  substantial dispute, to narrow the scope of disputed issues, and

8  to facilitate the presentation of cases to the trier of fact.

9          This does not mean -- this is my own decision on this

10 issue relatively recently -- that an RFA may only ask about

11 matters that the propounding party believes to be undisputed,

12 and the 1970 amendments to Rule 36 made clear that a party may

13 not object to an RFA solely on the ground that the request

14 presents a genuine issue for trial.  Although that is not really

15 the objection that is most prevalent in this particular case.

16         But again, since the purpose of the request is to

17 ascertain whether the answering party is prepared to admit with

18 regard to the matters presenting a genuine issue for trial, an

19 answer rather than an objection is the only proper response if a

20 party considers that it has been asked to admit something that

21 it disputes.  What we have here in a lot of these responses is

22 ambiguity.  In response to a properly constructed RFA, a party

23 must either admit the matter, specifically deny it, or state in

24 detail why the answering party cannot truthfully admit or deny

25 it.  An RFA denial must fairly respond to the substance of the

1 matter, and the responding party has an obligation to undertake

2 a reasonable inquiry of information known or readily obtainable

3 by it that allows the responding party to fairly admit or deny

4 the request.

5          So there are a lot of RFAs here.  If necessary, I will

6 go through them one by one and make determinations about whether

7 the responses are appropriate or not, but I would really rather

8 that we take a second stab at this to try to limit the scope of

9 items that I need to specifically rule on; not because I am not

10 capable of it or prepared to do it, but I think some guidance

11 will assist in getting these to a point where they may not be

12 quite as disputed.

13          So, look, I understand that it will take time to

14 address these RFAs with specificity, but this number of RFAs

15 certainly does not automatically constitute undue burden.  That

16 decision that I was just reading from dealt with, I don't know,

17 thousands of RFAs, which was a problematic situation for a

18 number of reasons, and that was a more clearcut case of burden,

19 but even that ultimately led to a decision requiring parties to

20 answer quite a few of those RFAs.

21          All right.  So let me just go through a few categories

22 that we have in dispute, and I will hear a little bit more from

23 you on these because that will help me to understand some of the

24 issues a little bit further as well.

25          One category that Mr. Troy flagged is with respect to

 1 | -- the first bullet point in his letter at ECF 36 requests --
 2 | RFAs 1, 2, 5, 7, 8, et cetera.  Let's look at a couple of those
 3 | because I do have a bit of confusion when I read these
 4 | objections.
 5 |         First of all, let me just also say, if you look at
 6 | Rule 36, there is nothing in there about General Objections, and
 7 | the whole notion of General Objections has been disfavored for
 8 | years in other contexts, particularly when responding to
 9 | document demands.  This idea of cross-referencing General
10 | Objections is really just not the way it's supposed to be done
11 | anymore, and part of the reason for that is it's hard to know
12 | which of the General Objections are meant to apply to these
13 | particular requests.  Are there really objections to all one,
14 | two, three, four, five General Objections?  Do each of those
15 | apply to each of the requests?  No.  Because some of these
16 | objectionable or allegedly objectionable terms don't even appear
17 | in some of the requests where the General Objections are
18 | invoked.  So will it be more cumbersome to specifically invoke
19 | the objections when appropriate?  Yes.  But that will also be
20 | much more appropriate in terms of the RFA responses.
21 |         Part of the way that perhaps you will be able to
22 | streamline some of these objections is to meet and confer
23 | specifically about the General Objections because if you can
24 | address the definitions in a way that is mutually agreeable, it
25 | might alleviate some of those concerns on the plaintiff's side

 1  while still allowing the defendants to get at whatever it is

 2  they are trying to get at.  I don't know if that's possible or

 3  not.  Some of these things may be too entrenched to actually

 4  work out in a meet-and-confer process, but that's what the meet-

 5  and-confer process is for.  There aren't 50 General Objections;

 6  there are five or six, five or six.  And that seems like

 7  something that might be able to be addressed, and also that

 8  would provide more clarity when we get to the actual responses.

 9          So let's look at Request for Admission No. 1, which is

10  representative of this whole category that Mr. Troy has brought

11  to the Court's attention.  Request for Admission No. 1 says,

12  "Admit that neither Wee Tai Hom," so the same individual who we

13  were talking about earlier, "nor Healite," H-E-A-L-I-T-E,

14  "Incorporated, gave you a photograph of the image shown in

15  JHP-01."  I assume that's a Bates number, right, Mr. Troy?

16          MR. TROY:  Actually, that's from the -- what we had

17  done was, because of the number of photos, we had combined them

18  into --

19          THE COURT:  Oh, the pdf portfolio.

20          MR. TROY:  The pdf portfolio.

21          THE COURT:  Which you referenced.  I don't need to see

22  the portfolio, but I thank you for bringing them.  So JHP-01 is

23  some sort of reference point that is supposed to be a common

24  reference point.

25          MR. TROY:  It's the first document in the portfolio,

1  in that -- in Portfolio One.

2          THE COURT:  And I understand -- thank you.  And I

3  understand why to achieve maximum clarity, the plaintiffs

4  included the thumbnails of these photographs in the responses.

5  It wasn't entirely necessary to do that, but I understand.  We

6  are trying to be precise here, and so I appreciate that

7  considering the need to make sure we are all talking about the

8  same things, but the response is that:  "Subject to the General

9  Objections," we have now talked about that, "plaintiff admits it

10 did not, to the best of its recollection, find this image in the

11 boxes of materials, but otherwise denies this Request for

12 Admission."

13         I mean, I don't know what that means, and what -- when

14 we're talking about the boxes of materials, I assume you mean --

15 I shouldn't assume -- but I am going to assume we mean materials

16 received from either Wee Tai Hom and/or Healite Incorporated?

17         MR. SALTA:  Correct.

18         THE COURT:  And that is somehow the way -- if I

19 understand correctly -- that plaintiff traces some of the copy-

20 rights at issue in these materials?

21         MR. SALTA:  Well, it might be some of the way, but I

22 believe what Mr. Knull was objecting to was the word "gave."  In

23 other words, what he is arguing, I believe, is that:  What do

24 you mean by "gave"?  Physically gave?  Or transferred the rights

25 thereto?  Because there is a contract.  What do you call -- a

1  contract of sale of all the business assets, including

2  copyright, to Mr. Gallagher.  So is that a giving?

3          THE COURT:  Okay.  And that's one of the General

4  Objections.

5          MR. SALTA:  Exactly.

6          THE COURT:  Okay.  And that makes sense now to me.  I

7  didn't really understand why that was fraught, but okay.

8          Mr. Troy, I mean, is that something that you think

9  could be worked out in terms of the definitional aspect?  I

10 mean, I understand -- well, tell me a little bit about this

11 because I'm just having difficulty understanding to some extent

12 what exactly is being denied here, but now I take the point that

13 the plaintiffs are denying that these -- this photograph was

14 given to them because in their understanding of what it means to

15 have been given, it was given to them.

16         MR. TROY:  Your Honor, and we can go through every one

17 of the ones that I categorized with that, this actually goes to

18 the heart of the case because Mr. Gallagher is on record of

19 having previously said in a filing with this Court that after he

20 received all of the materials from Wee Tai Hom/Healite, he

21 documented that, which was the first time there's any

22 documentation of any of these photographs, in the 1992 Deposit

23 Copy.  So the image does not appear in the 1992 Deposit Copy,

24 yet this is one of the many images that Mr. Gallagher has filed

25 takedown notices on.  So we are struggling to find out what is

 1  the scope of his copyright claim, and it requires us to go down

 2  to individual photographs to understand that.

 3          Now, if Your Honor has a better word than "gave," that

 4  would be fine with me, but we struggled with trying to come up

 5  with an appropriate word for each of these interrogatories in

 6  order to nail down what is in this universe of copyright claim.

 7          MR. SALTA:  If I may, Judge?

 8          THE COURT:  But -- hold it one second -- are you

 9  genuinely trying to determine whether Mr. Gallagher and Richtone

10  are asserting a copyright claim over this photograph?

11          MR. TROY:  Of course, because the --

12          THE COURT:  Well then, why not ask that?

13          MR. TROY:  Well, but here --

14          THE COURT:  You are trying to get at here what the

15  basis of that copyright claim is, and you're trying to get him

16  to admit that he has no basis for the copyright claim, which of

17  course he is not going to admit because that's the issue in the

18  case.

19          MR. TROY:  I understand that, Your Honor, but in order

20  to have a claim to copyright, okay, given the fact that all of

21  this stuff was made 58 years ago, there is a chain of title.

22          THE COURT:  Okay.  I understand that, but that's the

23  issue in the case, right?  I mean, if there is a fact or even a

24  legal issue that you are trying to get an admission on, it can't

25  be:  Admit that you don't have a copyright on this photograph.

1           MR. TROY:  No.  Of course, I can't ask that.  But what

2   I am asking is, is:  Was this given to you when you acquired

3   these assets?

4           THE COURT:  Right.

5           MR. TROY:  That's the -- that's -- the sum and

6   substance of the question was:  Did you receive the image?

7           THE COURT:  And do you mean the -- in that case, do

8   you mean the actual physical image?

9           MR. TROY:  Yes.

10          THE COURT:  Do you mean -- okay.  And -- okay.  That I

11  understand, and I take it that there is no dispute that this

12  image is not in the 1992 Deposit Copy, right?

13          MR. TROY:  I'm unaware of a dispute on that point

14  or --

15          THE COURT:  Okay.

16          MR. TROY:  -- any of the other ones that we identified

17  in this line of questioning.

18          THE COURT:  Okay.  Mr. Salta?

19          MR. SALTA:  If counsel wants to ask if a physical

20  picture, a physical manifestation of this photo was actually

21  hand-delivered.

22          THE COURT:  Or delivered by any other means.

23          MR. SALTA:  Right, the actual picture was physically

24  delivered by hand or electronic means, that's one question that

25  can be answered.

1          THE COURT:  And the answer to that is no.

2          MR. SALTA:  Right.

3          THE COURT:  I mean, you admit that it was not.

4          MR. SALTA:  Right.

5          THE COURT:  Okay.

6          MR. SALTA:  But the rights thereto were -- I mean,

7  that's the whole separate thing that -- it's obviously where

8  this is going.

9          THE COURT:  Well, I mean, I think at some level it's

10 Mr. Troy trying to ascertain what the basis for the claim of

11 copyright is, and if -- I don't know as a legal matter whether

12 it's meaningful to rule out the physical transfer or --

13         MR. SALTA:  Fair enough.

14         THE COURT:  If that is meaningful, then so be it.  I

15 mean, does that -- Mr. Troy, does focusing on the physical

16 transfer of the photograph or negatives, if that comes up later,

17 does that satisfy what you are trying to get at in terms of

18 narrowing the issues?

19         MR. TROY:  I mean, if we -- if we want to modify our

20 requests, I mean, we can certainly do that.  I -- you know, I

21 have to be honest with you, we struggled for probably a month

22 trying to come up with appropriate wording to make it clear what

23 we were asking.

24         THE COURT:  Right.

25         MR. TROY:  Because an RFA, just like you pointed out

1  earlier is, you know, what are RFAs all about?  And it's

2  basically is, let's get answers to questions that we can avoid

3  sitting in a trial for because if I had to go through a total

4  of, what --

5        THE COURT:  2,000 images or whatever.

6        MR. TROY:  Well, there is the 2,000 images, but the

7  focus is really more on the 43 images that are contained in the

8  portfolios because those are the images where the plaintiff has

9  done takedowns yet we cannot find these photographs in the

10  Deposit Copy that Mr. Gallagher previously represented was

11  essentially a memorialization of everything that he got or

12  received from Healite/Wee Tai Hom.

13        MR. SALTA:  Okay.  That should be fairly easy to

14  request and to answer what physically was given.

15        THE COURT:  Right.  I think that's right.  I mean, at

16  some level I think it's the concern and -- look, RFAs are always

17  a fraught exercise, frankly, for the responding party.  I was

18  never a huge fan of RFAs in practice because it often led to

19  this and didn't really wind up narrowing the issues.  It just

20  made for more discovery disputes, but it's provided for in the

21  rules, and we have to address them, and that's fine.

22        But I think if the real question is to confirm that

23  this image, this photograph was never physically transmitted by

24  Mr. Hom or Healite to the plaintiff, whether that's Richtone or

25  Mr. Gallagher, then it can be asked that way, and that seems

1  like it should be answerable.  So I would -- again, this is what

2  I think we could achieve through the meet-and-confer process.  I

3  am going to facilitate this with some of these categories and

4  then encourage you to go back and either reframe or whatever

5  needs to be done with these requests, but it's best to work

6  through them first to see if there can be ways that they can be

7  answered.

8          And but I will say also with respect to the answer,

9  this idea that plaintiff admits that it did not, to the best of

10  its recollection, find this image in the boxes of materials, I

11  am not sure what -- is that trying to preserve a little bit of

12  room to say maybe it was or it wasn't?  That is an ambiguous

13  answer.  And if the answer is:  We can't determine that because

14  we don't have the necessary information, there is a specific

15  phrasing in the Rule 36(a)(4) that provides for how to answer a

16  Request for Admission if you don't have sufficient information

17  after conducting appropriate inquiry and diligent research.

18  So -- and it's not this.  So that puts the burden on the

19  plaintiff or the responding party to go and conduct that

20  appropriate inquiry, and it seems as though there should be a

21  relatively straightforward answer to:  Was it provided in a

22  physical form or not?  And we can try to dispense with some of

23  this dancing around the issue or trying to preserve certain

24  opportunities to potentially come back and have a different

25  recollection in the future because that is problematic as well.

1            All right.  So that's -- we talked about that

2   category.  Let's move on to the next category, and I refer to

3   this category as the "Christmas card objections" category.  I

4   don't really understand those objections, Mr. Salta.  This is in

5   the second bullet point.  RFA 8 is one example, but it's a whole

6   series there.

7            "Admit that either Hom or Healite gave you a

8   photograph of the image shown in JHP-08."  And again "gave."

9   We've got that issue.  It can be restated to make sure that we

10  are talking about a physical transfer.  The first sentence of

11  the response is the same, essentially, as what we just

12  discussed, "Subject to the General Objections, plaintiff admits

13  it did not to the best of its recollection find this image in

14  the boxes of materials, but otherwise denies this Request for

15  Admission."

16           Then there is this further explanation about, "This is

17  a Christmas card, apparently one of the annual cards which Joe

18  Pilates sent to clients of his business and was prepared for

19  that business purpose.  As it was well known that Joseph Pilates

20  promoted his business through annual holiday cards to clients.

21  This image was likely" -- it says "to," but I think it probably

22  means provided to or something -- there is a word missing there

23  -- "was likely to Mr. Pilates for limited publication in a

24  card."

25           But why do we need that whole second and third

1  sentence?

2          MR. SALTA:  I don't know, Judge.

3          THE COURT:  Okay.  That's just -- I mean, that's

4  interesting.  I mean, okay.  But it seems irrelevant to me and

5  just complicates the response to the Request for Admission in a

6  way that's really not helpful.  And so that -- that type of

7  response exists in at least eight of the Requests for Admission.

8  So let's take a look at that and see if that can be eliminated.

9          Couple of the other -- and I'm just going to jump

10  around a little bit.  And there are a couple of places where, as

11  I look through, I thought, that's just not a particularly well-

12  founded objection.  In No. 27, for example, "Admit that you

13  don't possess the negative for the image in JHP-26."

14          Plaintiff also objects to the use of the term "the

15  negative" as being vague?  Really?  I mean, come on.  We are

16  talking about negatives, photographs and negatives.  We have

17  talked about that in court now twice.  I don't think that that's

18  a vague or ambiguous term.  If it is, it would -- the vagueness

19  of that term would need to be explained further.  It seems

20  perfectly clear to me.

21          And also the use of quote-unquote "negative

22  admission," which is has nothing to do with the negative.  It's

23  just objecting to the phrasing of -- the double-negative

24  phrasing of the request.  I mean, whether that's an artful

25  phrasing or not, that's not a basis for an objection

1 particularly.

2          So the plaintiff denies the Request for Admission.

3 That's fine, meaning -- which I would interpret to mean that the

4 plaintiff possesses the negative for the image in JHP-26 because

5 to deny the request that you don't possess the negative would be

6 to suggest via logic that you do possess the negative.  And if

7 that's the case, fine.  But the objections there are not

8 particularly well-founded, and they are not necessary, either.

9          29 is the same thing.  Again, that's actually denied.

10 So it's just -- if it's going to be denied, just deny it.  It's

11 not that complicated.  If the plaintiff possesses the negative,

12 the plaintiff possesses the negative.  So that's a denial.

13          MR. TROY:  Excuse me, Your Honor.

14          THE COURT:  Yes.

15          MR. TROY:  I don't mean to interrupt, but --

16          THE COURT:  Sure.

17          MR. TROY:  -- this is an example of one of the times

18 where plaintiff's counsel inserted the wrong picture from the

19 portfolio that we were asking about.

20          THE COURT:  Okay.  Well, that's -- I didn't realize

21 that, but this is -- I mean, there are a couple of bullet points

22 here where the concern is that plaintiff failed to respond to

23 the correct images.  I mean, that's a quintessential example of

24 something you should have met and conferred about.  I mean --

25 okay.

1        MR. TROY:  An amended response was --

2        (Cross-talk)

3        THE COURT:  Not with respect to 28 through 30.  That

4   was only with respect to 50 -- so a couple of the ones in the

5   50s.

6        MR. TROY:  56 to 59.

7        THE COURT:  56 to 59, although apparently there is

8   some objection to the way that was done also.  So but this is 28

9   through 30 where Mr. Troy claims that plaintiff failed to

10  respond to the correct images for those three.  That was -- I

11  was going to come to that in a moment, one of the next items on

12  my list.

13       MR. TROY:  Sorry.

14       THE COURT:  Mr. Troy, if there is confusion about

15  which ones are which, just fix them.  Talk to each other.  Get

16  it straightened out.  I'm sure to the extent it was -- that the

17  wrong images were inserted, I have to believe that that was a

18  good-faith mistake.  I mean, it's -- no one is going to get away

19  with that, so it's not particularly clever to try to do that.

20  So just fix them.  You've got to talk to each other and get them

21  fixed and get it done in a way that makes sense and actually is

22  addressing the items that Mr. Troy is attempting to address.

23       I will say there are a couple of these RFAs that I

24  also don't particularly think are well-worded and that the

25  objections seem appropriate.  The ones that immediately jumped

1 to mind were No. 64.  "Admit that there are photographs in the

2 book depicting Clara Pilates that Hom or Healite did not give

3 you."

4          "Plaintiff is without knowledge as to which images

5 might be covered by this vague request, and therefore plaintiff

6 denies."

7          I mean, that's -- you know, we're talking about a

8 book.  How many images are in that book?  I mean, I'm not sure

9 exactly what is accomplished by that Request for Admission and

10 whether it's really appropriate to say, go look at this book,

11 which has dozens or hundreds of photographs, and examine each

12 one, and I guess all you need -- would really need to do is find

13 one that was not given or physically transmitted, but that's a

14 large and sort of sprawling request there.

15          MR. TROY:  First of all, Your Honor, the book is

16 Mr. Gallagher's book, so we are not talking about some random

17 book.

18          THE COURT:  I understand.

19          MR. TROY:  And this was the book that was published in

20 2000, I believe was the year, that was supposed to be an

21 historical perspective of Joseph and Clara Pilates; and the

22 reason for these questions is, is that we have other information

23 that these photographs were obtained from completely different

24 sources, including the University of Maine, the New York Public

25 Library, and yet they were published in Mr. Gallagher's book;

1 and where this gets even more complicated is, is that in the

2 many takedown notices that were filed by Mr. Gallagher and his

3 company, they have used the book, which is registered as a

4 compilation, and as you know from copyrights, a compilation does

5 not go to the underlying material.  It goes to the material that

6 is added, and in this case the, you know, organization of the

7 materials and whatever additional comments may be made.

8         So what we are trying to do is we are trying to kind

9 of put some fences around what are these copyright claims that

10 are being made?  Because he is going to third parties and using

11 the Deposit Copy certificate registration, and he is using the

12 book certificate of registration to take down other people's

13 websites.

14         MR. SALTA:  Judge, why doesn't counsel just ask:  Are

15 you claiming copyright to this picture?  Are you claiming

16 copyright to that picture?  It seems like this is such a

17 roundabout way of trying to get to a certain point.

18         THE COURT:  Or even if it's not:  Are you claiming

19 copyright?  It could be the same type of question that we talked

20 about with respect to the first category.  Did you receive a

21 physical copy of this picture on page 72 of the book from Hom or

22 Healite?

23         MR. SALTA:  Right.

24         THE COURT:  And if there are particular images in the

25 book that you have that concern about, then just identify them,

1 and then you will be able to argue at summary judgment or at

2 trial that some of these photographs in the compilation were not

3 traceable to this physical transfer; and to the extent that is

4 legally relevant, you will be able to have that information

5 without -- I actually think it will be more helpful for you, it

6 would seem, to be able to focus specifically as opposed to just

7 saying there's some -- some images in this book that may not

8 have been transmitted that way.  I think being more precise

9 about it will be helpful for everybody.

10          MR. TROY:  Well, Your Honor, there was -- it was in

11 our, I believe, interrogatories.

12          THE COURT:  Well, we'll get to the interrogatories in

13 a minute.

14          MR. TROY:  I believe we tried to ask those questions

15 in context of the interrogatories.

16          THE COURT:  Okay.

17          MR. TROY:  If we are trying -- as I say, we are trying

18 to understand what -- what is this claimed universe because it

19 keeps expanding and keeps changing from what was represented to

20 have occurred in 1992 versus today and all the takedown notices.

21          THE COURT:  Right.  I understand what you're trying to

22 do.  I just think that that particular framing of it in this

23 general, vague way is not a great way to go about it.  So I

24 think that -- that is an issue that I had looking at Request 64.

25 It's an issue that I had also from looking at Request No. 66,

1  which, frankly, I had a hard time deciphering that request

2  generally, but it sort of raises the same idea that we are

3  talking about some universe of things that are claimed to have

4  been in the possession of Joseph Pilates, and which of these we

5  are talking about, I don't know.  I'm not sure how the plaintiff

6  is supposed to provide a precise response because I'm not even

7  sure it's entirely clear what the universe of photographs that

8  he claims were in the possession of Joseph Pilates is.  I mean,

9  maybe that is clear to all of you.  It's certainly not clear to

10 me.  So there are a couple of those in here where we are talking

11 about these broader sets of materials that I think will benefit

12 from being more narrowly focused and more narrowly tailored.

13         MR. TROY:  Your Honor, if I may?

14         THE COURT:  Go ahead.

15         MR. TROY:  I will try to figure out how to restructure

16 it but, for example, the instance and expense language that is

17 in the RFA 66 --

18         THE COURT:  That's not the concern with the language.

19 I understand that that's a term of art.  It's the -- it's the:

20 Any of the photographs that you claim were in the possession of

21 Joseph Pilates at the time of his death.  That's the book.

22 That's the equivalent of the book in 64, right?  It's some

23 universe of materials that you are asking about in a broad and

24 undefined way.

25         MR. TROY:  Because plaintiff has -- has shifted their

1  legal theory throughout this case.

2          THE COURT:  Okay.  Look, I'm not making rulings on

3  these things.  I'm trying to provide a bit of guidance for you

4  to go back and take these under consideration.  If you feel the

5  need to persist with that framing, you have a pretty good sense

6  that I will probably not order that to have been admitted or

7  order a further response.  So you can choose to do whatever you

8  want with that, and if it's not possible to reframe it, you can

9  withdraw it or you could take another shot at it.  That's

10 entirely up to you.

11         There are a number of objections also to things having

12 to do with individuals who are not parties to the case where the

13 objection is in part that these individuals are not parties to

14 the action and without standing to make any discovery demands.

15 I mean, I think those are pretty well mooted now by the fact

16 that we're conducting discovery on the entire universe of

17 images.  So those responses will have to be revised to eliminate

18 those objections as well.

19         Look, so these are the number of different categories.

20 I don't think I've addressed each and every one of the bullet

21 points in the plaintiff's -- excuse me -- in the defendants'

22 letter at ECF No. 36, but I've addressed a number of them, and I

23 think there's enough guidance here to allow you to meet and

24 confer and either revise the RFAs or figure out which ones we

25 are going to insist on answers for.  I don't think all of them

1 need to be revised probably.  The responses are going to need to

2 be substantially revised, but you have to talk to each other

3 because if Mr. Troy wants to provide a revised set of RFAs, then

4 he is going to need some time to put that together, and some of

5 these issues I think should be the subject of a meet-and-confer

6 before Mr. Troy goes back to the drawing board because the idea

7 would be, hopefully, that when he does the second attempt at the

8 RFAs, that they will be questions that can be answered without

9 all of the throat-clearing objections and ambiguities that are

10 currently present in the responses.

11        So look, the deadline for discovery is January 31st.

12 It's a busy month with the holidays and whatnot, so make sure

13 that the RFAs are served within the next week or two and meet

14 and confer before that so that the responses can come in in mid

15 January, and if there are issues to be worked through even after

16 that, you can bring them to my attention then, and at that point

17 I will just rule on them, you know, whether that's in a

18 conference or in a written order.  I think at that point you

19 will have done the best you can to minimize the scope of the

20 disputes, but right now we have disputes with respect to -- I

21 don't know -- 70 of the 90.  That's not a good use of my time or

22 yours because even if I were to go through all 70 of those, then

23 you would have to go back and do them again anyway.  So I am

24 going to ask you to do them again first, and then -- based on

25 what we've talked about here today, and then we will see what's

1  left in terms of disputes.  Okay?

2          Anything else that anyone wants to say about the RFAs

3  before we move on to the interrogatories?  Mr. Salta?

4          MR. SALTA:  No, Judge.

5          THE COURT:  Okay.  Mr. Troy?

6          MR. TROY:  No, Your Honor.

7          THE COURT:  All right.  Let's, while we are talking

8  about the RFAs, Interrogatory No. 12, which on the one hand, I

9  am inclined to just set aside entirely because it was raised

10 sort of late in the process, and the plaintiff has not had an

11 opportunity to respond to that.  Also, in light of the revised

12 RFA process that we are about to go through, I don't want to get

13 into too much detail about request -- Interrogatory No. 12.  I

14 will just say I have never seen an interrogatory quite like

15 that.  I have never seen one.  I don't think it's appropriate,

16 frankly.  I would be curious to see some authority for that as

17 an appropriate form of interrogatory because Mr. Salta and Mr.

18 Knull are right.  First of all, it's an 86-part interrogatory,

19 at least.  I mean, it's 86 parts or it's not 86 parts because

20 some of the items are going to be on qualified admissions, but

21 it's probably a 30 -- at least 30- to 50- to 70-part

22 interrogatory with one, two, three, four subparts to each.  So

23 on the interrogatory count alone it's probably impermissible.

24          But on top of that, as I laid out when going through

25 the standard for what Rule 36 is meant to accomplish, it's not a

1  discovery device, and this is essentially taking the RFAs and

2  turning them into a discovery device, and that's an interesting

3  and creative approach to kind of getting around the limitations

4  of Rule 36; but basically, transmitting or transferring RFAs

5  into multi-part interrogatories that require substantive

6  responses in this fashion is just -- it's not anything I have

7  ever seen.  So I'm not inclined to make the plaintiff submit a

8  detailed response because I just don't think that that's

9  appropriate.  But let's see where we are at the end of the

10 revised RFA process because maybe there is a narrower way of

11 asking about one or two or three items that might cause me to

12 look at that differently, but on the surface that just seems

13 patently improper.

14         Let's turn to the interrogatories, which we had before

15 the Court at our last conference but we set aside for a variety

16 of reasons.  There are a total of one, two, three, four, five,

17 six, seven interrogatory responses that are at issue here.  I

18 wonder to what extent some of this overlaps with the RFA

19 responses, but we can talk about that.

20         Mr. Salta, before I forget, we covered the RFAs.

21 Coming back to your point about experts, is it your position

22 that having expert discovery take place sooner would limit the

23 scope of the work on the RFAs or is that really more a point

24 about the interrogatories?

25         MR. SALTA:  Well, I was just thinking, for example, on

1  the issue of what was physically given to Mr. Gallagher by Hom,

2  and if the expert were -- with Mr. Troy -- go through the box of

3  the material, that would answer a lot of questions.

4        THE COURT:  How would it answer the question of what

5  was given to him by Hom?

6        MR. SALTA:  Well --

7        THE COURT:  You mean if it's there?

8        MR. SALTA:  If it's there.

9        THE COURT:  And it was given to him?

10       MR. SALTA:  If it's there, yeah.

11       THE COURT:  Okay.  Mr. Gallagher can just go through

12  and tell us what is there and what isn't there.  That's all --

13  that's not expert work.  That's just -- that's a fact question.

14       MR. SALTA:  Okay.

15       THE COURT:  I understand the overlap because at some

16  -- at some level there is going to be an amount of work that the

17  expert would have to come in and look at all of this stuff.

18       MR. SALTA:  They would want to verify it anyway.  So

19  he can say, yeah, I got it.  Yeah, show me.  I mean, it's going

20  to involve the defendant anyway to go over the stuff to see what

21  was there or what's there.

22       THE COURT:  Well, not if he says he didn't get it, and

23  then he confirms that it's not there because that's --

24       MR. SALTA:  Correct.  I am thinking about the other --

25  the converse of that.

1          THE COURT:  Okay.  But I understood that Mr. Troy was

2    mostly -- and maybe I have this wrong -- but mostly focusing on

3    images that he thinks Mr. Gallagher did not receive in that

4    process.

5          MR. TROY:  Correct, Your Honor.  And just to add to

6    that, subsequent to the transaction in 1992, Mr. Gallagher

7    acquired the old home of Joseph and Clara Pilates.  I'm not sure

8    the year.  Mr. Gallagher could probably answer that.  I think it

9    was 1998, but based upon representations, and Mr. Gallagher

10   seems to be very prolific on social media, there is a treasure

11   trove of additional materials that he's received or that he now

12   claims ownership over because he found copies of these materials

13   in the house; and we're still trying to segregate what was

14   supposedly acquired as part of the business versus what was

15   supposedly acquired by purchasing the house.  And as you know,

16   by purchasing the house, even -- whatever contents are in the

17   house does not confer copyright.  It's just the -- you know,

18   it's just a mere possessor of property, not the possessor of a

19   copyright.

20         THE COURT:  We will evaluate the legal claim.

21         MR. SALTA:  That's a legal question, and there is a

22   Purchase Agreement that transferred all assets and -- of the

23   business and the copyrights included to Mr. Gallagher, so

24   whether it's found later in the bathroom of the house or it was

25   given to him by Mr. Hom I think is quite irrelevant, but if you

1  want that information.

2          THE COURT:  Well, I mean, I think the point Mr. Troy

3  is making, if I understand it correctly, is he is trying to

4  figure out what the basis of the copyright claim is for these

5  different materials, and for some it's going to be that they

6  were physically transferred.  For some it's going to be that

7  they were pursuant to this contract of sale.  For some it's

8  going to be whatever else it's going to be, and we are just

9  trying to get to a point where the basis of that is clear, the

10 factual basis.  And then Judge Karas will have the opportunity

11 to decide whether that is -- that factual basis supplies a valid

12 legal basis, whether it's pursuant to a contract or pursuant to

13 whichever statutes are at play when it comes to those materials.

14 I -- for discovery purposes, though, that all seems relevant.

15         MR. SALTA:  Okay.

16         THE COURT:  And so, you know, look, these -- in the

17 interrogatories there were some objections that were based

18 largely on the idea that discovery shouldn't be so broad because

19 the counterclaim is what brought all of these additional images

20 and allegedly copyrighted materials within the ambit of this

21 case.  But that's no longer a valid objection, obviously.  So

22 that -- that gets to Item 4 in particular, Interrogatory No. 4.

23         To the extent that these objections are based on

24 burden, I don't have a great sense of how burdensome it is for

25 the plaintiff to respond to some of these interrogatories.  So

1  Interrogatory No. 3, this gets back to something that's similar

2  to what we just talked about with respect to the book.

3  Interrogatory No. 3 is:  "Identify all photographs or other

4  matter reproduced in the book that was not in your possession as

5  of September 1st, 1992, stating the date on which you received

6  such photographs or other matter, the person from whom you

7  received it, and the consideration you paid or gave such

8  person."

9          I just don't really have a clear idea that -- as to

10 how burdensome these requests are, and the response seems to be,

11 you know, to provide a list of a handful of pages in the book

12 that where the materials were found in the house, for example,

13 and then there is another reference to something called "Return

14 to Life."  Okay.  And that didn't answer all of the parts of the

15 interrogatory, but it provided some information.  I'm not sure

16 if that information is clear or not to Mr. Troy.  I mean,

17 clearly, it didn't attempt even to address all of the elements

18 of the interrogatory, and it's not -- again, I have a hard time

19 ascertaining whether that is meant to be a way of addressing

20 each part, meaning that those are the only pages in the book

21 where materials were not in Mr. Gallagher's possession,

22 Richtone's possession as of September 1st, 1992.

23          So, again, to the extent part of the objection here is

24 burden, I'm not sure I understand the burden, and you can

25 explain that to me, Mr. Salta.  The objection would be "based on

1  standing" is really not a particularly valid objection at this
2  time for all of the reasons we've talked about; and you know, to
3  the extent part of the response is, "not all such material is at
4  issue in this litigation," I'm not really sure if that's
5  particularly valid anymore because what's at issue in this
6  litigation is certainly broader than what you and Mr. Knull were
7  suggesting it was in responding to these interrogatories back in
8  September.

9          So I'll let you weigh in on some of that.

10         MR. SALTA:  The way I would rewrite this -- again,
11 this was from Mr. Knull -- but the way I would rewrite this is
12 basically saying the photographs on pages 19, 29, 105, et
13 cetera, were found in the house, which is obviously post 1992,
14 as is the photograph on page 151 "Return to Life," which also is
15 post 1992.  And with regard to -- I guess we could flesh out how
16 he received it, the consideration, if any, that was paid.  That
17 could be answered pretty easy.  But with regard to the pictures,
18 I guess that's the answer.

19         THE COURT:  Okay.  And, Mr. Troy?  Your thought on
20 that?

21         MR. TROY:  A clear answer along those lines would be
22 great because we are trying to, as I say, narrow down this
23 universe.

24         MR. SALTA:  Yeah, I believe it was probably understood
25 between Mr. Troy and Mr. Knull that by saying it was found in

1  the house was -- I wouldn't have written it that way, but it

2  means it was after 1992 because the house was purchased after

3  that.  So --

4          THE COURT:  Well, I mean, that -- even if that is

5  clear to Mr. Troy and Mr. Knull, it's not clear to --

6          MR. SALTA:  It wasn't clear to me the first time I

7  read it, either.

8          THE COURT:  It was not clear to me, and to the extent

9  that there would be any interest in using these materials for

10 other purposes in the case, it wouldn't necessarily be clear

11 without further explanation.  So, you know, a more comprehensive

12 explanation there just to address the specific point raised

13 would be helpful.

14         All right.  Let's look at No. 4.  "For each of the

15 photographs that appear on pages 14 through 168 in the pdf of

16 the collection," which is a section of a document that has a

17 Bates number, "identify the photographer who took such

18 photograph and the year in which such photograph was taken.  If

19 you don't have a record of the actual year, state what you

20 believe to be the estimated date."

21         Again, I mean, there are a variety of objections here,

22 including that, you know, this is a fishing expedition on behalf

23 of litigation funders, but again, I think that should be set

24 aside here unless someone tells me that these images are not

25 within the ambit of the counterclaims, but I don't think that is

1 | the case.  So there doesn't seem to have really been any answer
2 | to this, Mr. Salta.

3 |         MR. SALTA:  Okay.  I would also add -- well, yeah.
4 | Isn't this also basically asking for multiple interrogatories?
5 | I mean, we are kind of like hitting the same issue of how many
6 | responses, sub-responses are involved here.

7 |         THE COURT:  I mean, that is a fair point, frankly,
8 | Mr. Troy.  I mean, you know, depending on how you were to read
9 | these interrogatories, they could easily be read as well above
10 | the limit provided by the federal rules.  I mean, there are
11 | different ways of interpreting what is a subpart and what -- and
12 | how we're supposed to count the interrogatories, but a lot of
13 | these seem to be multi, multi, multi-part interrogatories.  We
14 | talk about different photographs and, you know, the five
15 | different pieces of information that we are trying to get about
16 | each photograph.

17 |         Now, should each photograph be considered an
18 | interrogatory?  Should each subquestion about each photograph?
19 | I mean, I think we don't have to get to that point.  If you are
20 | looking at a photograph, and you're trying to get information
21 | about who took the photograph and when, who took the photograph
22 | and when are not two separate interrogatories, but who took
23 | Photograph 1, who took Photograph 2, who took Photograph 3, are
24 | those not separate interrogatories?

25 |         I will say one thing that's interesting about this set

1  of interrogatory responses is we don't deal with this type of

2  interrogatory in this District very often because there are

3  local rules that provide for limitations on what can be asked in

4  terms of interrogatories.  There are no objections along those

5  lines for -- I'm not sure why -- because there might be valid

6  objections based on some of those Southern District of New York

7  limitations, but in any event, this set of interrogatories does

8  seem to get at a whole lot of information, Mr. Troy, that I am

9  not really sure it's appropriate to order responses to each and

10  every part of each and every one of these interrogatories.

11       MR. TROY:  This interrogatory highlights the shifting

12  sands that we've been dealing with in this litigation, and that

13  is, is that I have communications from Mr. Knull going back to I

14  think 2015 or '17 in connection with a dispute with another

15  client of ours where he made the clear representation that the

16  photographs are -- we don't know who took any of the

17  photographs.  Then all of a sudden in halfway through this

18  litigation we are finding out that Mr. Knull now believes, and

19  that there is evidence which we have not seen any of, that

20  Joseph and Clara Pilates took these pictures, including using

21  whatever was a selfie back in those days.  And what we are

22  trying to again get at because it's Mr. Knull's position has

23  been -- and that we've been dealing with the last, what, seven

24  years -- is, is that by having the mere possession of the

25  negatives, by having received this through this chain of title

 1  of these, as he says, unpublished or limited published works,
 2  that he doesn't need to know who the photographer was.  He can
 3  just simply claim ownership of it, which is antithetical to the
 4  law.  So we are trying to get to the bottom of:  Well, which
 5  ones fall in this category?  Which ones fall in this category?
 6  Which ones fall in this category?  We are trying to understand.
 7  I mean, I can't help but that there is over 2,000 photographs.
 8              THE COURT:  Well --
 9              MR. TROY:  Okay?  And then just to add to that, if you
10  don't mind.
11              THE COURT:  But that begs the question of whether
12  interrogatories are the appropriate vehicle to get all of the
13  information because -- and I will say, and that doesn't let the
14  plaintiffs off the hook in terms of providing the information.
15  I'm not suggesting that those inquiries are irrelevant.  They
16  seem like they may very well be relevant, but whether
17  interrogatories are the best way to get that information as
18  opposed to a deposition is a different question.  Now --
19              MR. TROY:  Well, Your Honor --
20              THE COURT:  But I will say -- let me just finish.
21              MR. TROY:  Okay.
22              THE COURT:  A deposition where Mr. Troy has to ask
23  thousands of questions about all of these things is going to
24  take forever, and while there is a presumptive limit on the
25  scope of a deposition under the Federal Rules of Civil

1  Procedure, I am not -- by suggesting that doing this through the

2  vehicle of an interrogatory might be problematic or overly

3  burdensome, I'm not suggesting that that will allow plaintiff to

4  avoid answering those questions.  They might have to be answered

5  in a different form or a different setting, but certainly if

6  there is going to be an inability or an unwillingness to answer

7  those questions in interrogatory form, they would have to be

8  answered in deposition form, and I would have to imagine that

9  that deposition could not be completed in seven hours.

10         So again, without ruling in advance on any issue, that

11  seems almost inevitable because there are a lot of different

12  components here, and the defendants are trying to get clarity as

13  to what the scope of the claims are and what the scope of the

14  defenses are going to be, which plainly seems to fall within

15  Rule 26 and the permissive scope of discovery pursuant to that

16  rule.

17         So, Mr. Salta, I mean, it's a fair point to say that

18  there are a lot of different components here but, you know, if

19  they are not going to be answered this way, they are going to

20  have to be answered some other way.

21         MR. SALTA:  Oh, understood.  And if maybe counsel

22  could whittle down the universe of photographs, that would be

23  helpful as well.

24         THE COURT:  Okay.  Go ahead, Mr. Troy.

25         MR. TROY:  What Mr. Salta is actually asking me to do

1  is to pretend that Judge Karas has ruled on his motion to

2  dismiss Count Three.

3          THE COURT:  No, I don't think he's saying that.  I

4  think he's asking if there is a way to focus the inquiry.

5          MR. SALTA:  Yes.

6          THE COURT:  If the answer is no, because you need to

7  have this information for all 2,000 items, and those things need

8  to be covered individually, well then, that may be the answer.

9  I don't -- it may not be even possible to have representative

10 groupings or samples.  I don't know.  It may be that there are

11 some where you genuinely know the answers to these questions

12 already, and you don't really need to get them laid out

13 specifically.  I don't know that, either.  Maybe not.  And maybe

14 because you believe that there have been shifting explanations

15 you can't rely on what you think you know because you don't want

16 the information to change again in the course of this case.  I

17 understand that if that's your position as well.

18         So what I would like to see happen, though, is there

19 to be some tailoring to some extent because I am sensitive to

20 the objection that this appears to be, or at least could easily

21 be interpreted to be, a list of interrogatories that vastly

22 exceeds the permissible scope of interrogatories.  I'm not sure

23 how we define what one interrogatory is.  I might have to hear

24 further briefing from you or short submissions from you on that

25 issue, but, you know, if we are talking about 1500 images for a

1  particular interrogatory, I don't see how that can realistically

2  be construed as one interrogatory.

3              MR. TROY:  I appreciate the dilemma.  I mean, back in

4  my earlier days of practice, we didn't have these same

5  limitations.

6              THE COURT:  Uh-huh.

7              MR. TROY:  And I do appreciate that.  You know, we

8  could have just as easily submitted every single one of these as

9  an RFA.

10             THE COURT:  Right.

11             MR. TROY:  And basically said, you do not know who the

12 photographer is.  Admit that you don't know who the photographer

13 is.

14             THE COURT:  Right.  There are no limitations on RFAs,

15 as you know.

16             (Cross-talk)

17             THE COURT:  -- crazy case.

18             MR. TROY:  So we are going to get at the same thing

19 through a slightly different vehicle.  I mean, if that's really

20 what plaintiff is insisting on, I'm happy to give them a set of

21 RFAs that are 4,000 questions long.

22             MR. SALTA:  Or you can ask:  Who -- out of all these

23 pictures, who do you know took the pictures, et cetera,

24 et cetera?  It could be zero.

25             THE COURT:  Well, again, so now this gets to my

1  earlier point about meeting and conferring because once you

2  start talking to each, I feel like I'm witnessing a meet-

3  and-confer happening live in front of me, which is not really

4  what I want to do.

5          So I think the overarching point here is that I think

6  Mr. Troy is absolutely correct that these inquiries are going to

7  be answered at some point in the discovery process through some

8  discovery vehicle.  So it's perhaps a pyrrhic victory to beat

9  back the interrogatories only to then have to face thousands of

10 Requests for Admission and then potentially try to argue that

11 those are unreasonable because they are too burdensome.  I don't

12 know.  We can encounter that question on a different day.  But

13 whether it's through RFAs, whether it's through deposition

14 testimony, whether it's through interrogatories, these questions

15 are going to have to be answered; and again, I leave myself some

16 room to say that there may have to be some outer limits on it

17 because it's not -- at the end of the day, it still has to be

18 proportional to the needs of the case.  But when we are talking

19 about a case having to do with whether certain images and

20 materials are subject to copyright protection, understanding the

21 factual basis for that copyright claim seems highly relevant to

22 and proportional to the needs of the case.  What's problematic

23 is the sheer volume here, and that's what potentially makes it

24 burdensome and may raise questions of proportionality.  But

25 that's why I encourage you to discuss this with each other and

1  figure out if there are ways of streamlining this or creating a

2  process for providing the information that's being requested in

3  some form because the requests fundamentally are getting at

4  information that seems certainly relevant to the claims and

5  defenses in the case, and it's a matter of figuring out how that

6  information is going to be transmitted.

7          So we may very well have to have further discussions

8  about that, but I think in the first instance you all should

9  have discussions with each other about how to go about getting

10  that information, providing that information, having it be as

11  clear as possible.  Look, if it were me, I'm not sure I would

12  want to have my clients sit through days and days of deposition

13  about each and every one of these photographs.  That's hard to

14  prepare for.  It's hard to be precise about.  It's a challenging

15  way to go about this, especially if in order to prepare for that

16  deposition a person would have to conduct the same research that

17  he or she would have to conduct in order to answer these as

18  written interrogatory or RFA responses.

19          But, you know, again, in the Southern District of New

20  York this type of interrogatory practice is really not favored,

21  and there are local civil rules that govern that, so I have a

22  hard time sitting here and saying that these interrogatories all

23  must be answered in this way because, again, that's just not the

24  way we typically do things here.  It's a bit of a quirk of

25  S.D.N.Y. civil practice.  I acknowledge that.  But the rules are

1  what they are.  And so given that concern, given the concern

2  about the volume of the interrogatories, you know, I'm not going

3  to sit here and say that they need to be answered as written in

4  their entirety, but again, I'm trying to provide you some

5  guidance here to make this process as efficient as possible.

6  That impression that I have is not because they are improper

7  questions.  Okay?  They are questions that are going to need to

8  be answered, and the Local Civil Rule 33.3 attempts to funnel

9  the discovery into other formats, most notably depositions; in

10 this case, RFAs potentially as well, given the nature of the

11 requests.  So it doesn't -- it doesn't absolve the plaintiffs

12 from having to answer the questions.  And frankly, this is a

13 situation where answering them in interrogatory form might be

14 better because it could be done over time.  It could be done in

15 a way that makes sure that the answers are provided clearly and

16 efficiently.  I don't know.

17        So I leave you with that, and again, encourage you to

18 meet and confer further about this to figure out how best to

19 proceed because these questions are going to need to be answered

20 or at least a substantial percentage of them are going to need

21 to be answered in some form, whether that's plaintiffs agreeing

22 to answer these interrogatories, defendants reframing and

23 submitting a boatload of additional RFAs, or Mr. Troy preparing

24 an extremely long deposition outline, and Mr. Gallagher

25 presumably having to sit through an extremely long deposition to

1 answer all of those questions.  I mean, they are all suboptimal,

2 frankly, as ways of getting at it, but, you know, I still

3 continue to think, as I said last time, dealing with all of this

4 in one litigation instead of 50 separate litigations in 50

5 different courthouses across America as we litigate each of

6 these takedown notices separately is probably more efficient in

7 the long run even if it's going to be burdensome in the short

8 run.

9          So I don't really think that there is much more for me

10 to say on that.  I hope I've given you some guidance that will

11 be useful.  Again, maybe it's (noise interruption) resolve

12 disputes.  I'm not trying to sidestep that responsibility, and I

13 will come in and make formal rulings on all of these things if

14 need be, but I think everyone will be best served if you went

15 and tried to figure out a path forward here over the next couple

16 of weeks rather than have me make rulings and then have you go

17 back to the drawing board and do it all again anyway.  I think

18 that probably duplicates the work in addition to adding layers

19 of review from me.  So I think having you take a further shot at

20 these responses and figuring out where there might be points of

21 agreement would be the best way to go forward.

22          Mr. Salta, what else should we discuss today?  I think

23 that's it from my lengthy agenda, but tell me what I'm

24 forgetting.

25          MR. SALTA:  Well, we have the other -- Interrogatories

1  6 and 7 was also objected to, and --

2         THE COURT:  I'm just -- just hold on while I get that

3  one.  By the way, I did -- while I'm looking for that -- there

4  was sort of an additional item thrown in in Mr. Troy's letter

5  having to do with seeking complete responses to Request Nos. 44,

6  45 and 46 from the third request for production of documents.

7  That's the first I heard of it is when I got this item in the

8  agenda, so I'm not going to address that.  Plaintiffs haven't

9  even had a chance to respond to that yet.  So I haven't

10 forgotten about that one, but we're not going to discuss that

11 one today.

12        All right.  Interrogatory No. 6, "Identify by

13 indicating the page number and position on the page each

14 photograph in the book for which you possess the original

15 negative."  And then No. 7, "Identify by indicating the pdf page

16 or Bates number and position on the page each photograph in the

17 collection for which you possess the original negative."

18        MR. SALTA:  Now that -- that -- that's kind of like

19 what I was getting at earlier.

20        THE COURT:  The expert issue?

21        MR. SALTA:  Uh-huh.  I mean, basically, the defense is

22 putting the burden on us, which is an exceptional burden.  This

23 is a lot of work to -- I really don't know how long that would

24 take or if it's even possible without us getting an expert.  I

25 don't know.  I don't know the quality of the negatives.  These

1  are some of them from the '30s.  I mean --

2            THE COURT:  Okay.  I mean, it's a little bit

3  surprising to me to hear you say that, Mr. Salta, because I

4  mean, again, maybe this is just my lack of information about the

5  universe of materials here, but how many negatives do you have?

6            MR. GALLAGHER:  About 1400.

7            THE COURT:  Okay.  And how many -- how many

8  photographs are there in the book?

9            MR. GALLAGHER:  At least 2 or 300.

10            THE COURT:  Two or 300.

11            MR. GALLAGHER:  I think so.  I don't remember offhand

12  exactly what number they are, but --

13            THE COURT:  That's fine.

14            MR. GALLAGHER:  It's 200 pages, and some pages have

15  lots of photographs because they are compilations, and some are

16  single photographs, so I never really added up exactly how many

17  are in the book.  So --

18            THE COURT:  The estimate is perfectly fine,

19  Mr. Gallagher.  Thank you.

20            And just in case we get this transcript transcribed at

21  some point, that was Mr. Gallagher speaking.

22            And in terms of the collection, approximately?

23            MR. GALLAGHER:  The collection?

24            THE COURT:  What is defined here as "The Collection,"

25  which is the original and new Pilates photo collection.

1　　　　　MR. GALLAGHER:  So that is about 2,000 because there's

2　the pictures of Joe, but there's also pictures that I also put

3　in there for a training manual that we took in '92.

4　　　　　THE COURT:  Okay.  So there are 1400 or so negatives,

5　200, 300 photographs in the book, and approximately 2,000 items

6　in the collection, roughly?

7　　　　　MR. GALLAGHER:  Yes.

8　　　　　THE COURT:  Okay.  And tell me -- that does seem like

9　a heavy lift, Mr. Troy.  I mean, tell me why it's important to

10　know the answer to these questions.

11　　　　　MR. TROY:  Your Honor, I hate to sound like a broken

12　record.

13　　　　　THE COURT:  No, but I'm asking you.  I mean, I've

14　heard everything you said, but again, you know, some of this is

15　-- there are overlapping elements to all of this.

16　　　　　MR. TROY:  We are trying to narrow down the universe

17　because, as I've explained, Mr. Knull has shifted his position,

18　and I'm not sure what position he is going to take either in a

19　summary judgment situation or at trial as to how it is that the

20　plaintiff claims ownership of all of these materials because

21　what has happened is, is --

22　　　　　THE COURT:  That's fine.  Let me just stop you there.

23　　　　　I mean, is it possible, Mr. Salta, that the argument

24　on the plaintiff's side at some point is going to be that with

25　respect to some of these materials he has ownership of the

1  negative, and therefore, he possesses the copyright?

2           MR. SALTA:  It's a further indication of it.

3           THE COURT:  Okay.  But that's going to be some

4  basis --

5           MR. SALTA:  It's not the --

6           THE COURT:  It's not the only thing.

7           (Cross-talk)

8           MR. SALTA:  -- be all and end all of proving

9  copyright.

10           THE COURT:  Right.  But is he going to rely on the

11  ownership of the negatives in part as the basis for legal

12  arguments he is going to make in this case?

13           MR. SALTA:  In part.

14           THE COURT:  But so then why wouldn't the defendants be

15  entitled to know which negatives he --

16           MR. SALTA:  And they are.

17           (Cross-talk)

18           MR. SALTA:  It begs the question of timing.  I'm

19  sorry.

20           THE COURT:  No, no.  I'm sorry.  Just are you saying

21  they are, it's just a question of when we should be able to do

22  that and how to do it most efficiently?

23           MR. SALTA:  Exactly.  After the -- what we can do here

24  insofar as fact discovery is concerned, they'll have an

25  opportunity after January 31st to bring in their expert -- and

1  you will need an expert -- to determine these issues.  We can't

2  do it.  It's just physically monumental at this point.  And

3  since they are bringing in an expert, anyway.

4          THE COURT:  So, Mr. Troy, I mean, is the possession of

5  the negative germane to any of the arguments you want to raise

6  in your briefing?

7          MR. TROY:  It is -- it is the plaintiff that has

8  staked out the position that possession of the negatives is *ipso*

9  *facto* ownership of the copyright.

10          THE COURT:  You dispute that.

11          MR. TROY:  I dispute that.  Well --

12          THE COURT:  But here is the question --

13          MR. TROY:  -- I have the communications.

14          THE COURT:  I mean, let me just stop for a second.

15  Typically in discovery -- I mean, I made a reference earlier to

16  there are cases where we defer expert discovery until after

17  summary judgment because it would truly be a savings if the

18  liability issue is resolved in favor of the defendant for the

19  parties to avoid the burdens and expenses of expert discovery

20  because some expert discovery purely relates to damages, and if

21  there's no liability, there's obviously no damage discovery that

22  needs to be done.

23          This seems like maybe we are getting back to a place

24  where we should be within the more traditional approach to

25  discovery, which is we do the expert discovery before summary

1  judgment.  I mean, why not do that?

2            MR. SALTA:  I agree.

3            MR. TROY:  Well, Your Honor --

4            THE COURT:  I know it's expensive, but why not do it?

5  Then you will have -- you will also get a lot of information out

6  of that, right?  I mean --

7            MR. TROY:  I'm sorry.  I can't agree with you on that,

8  and the reason for that is, is Mr. Gallagher is the one who

9  keeps making these claims, plaintiff, that they own the

10 negatives, and they have all of this treasure trove of

11 information that hasn't seen the light of day and that, you

12 know, they possess this, and because they process the negatives,

13 then they possess the copyright.  The expert isn't going to sit

14 there and go through negative by negative and line it up with

15 the Deposit Copy and say, oh, well, they're -- they have this

16 negative, but they don't have this negative.  They have this

17 negative, but they don't have that negative.  The expert is

18 going to verify that, in fact, the negative that they possess,

19 that they claim that the photograph was taken in 1942, that

20 based upon the film, is more likely than not that that is an

21 original photograph as opposed to a photograph that might have

22 been taken in 1970.

23           So, you know, deferring the expert isn't going to

24 solve this issue.

25           MR. SALTA:  But if I may, if I recall last time,

1 counsel was ready to go himself and do it himself and look at

2 the negatives, take pictures, et cetera.  Okay.  So maybe we can

3 save money on the expert for later, if necessary, to verify the

4 age of the negatives or whatever, but you can come -- subject to

5 the protective order, of course -- and take those negatives,

6 look at them, and compare them with what's in the book or

7 whatever else.

8            THE COURT:  So here, this is what makes this a little

9 bit of an unusual discovery issue.  In the ordinary course, the

10 plaintiff, whoever is asking for the -- the defendants in this

11 case asked for records.  The records are produced, and then the

12 requesting party reviews those records to see what, if anything,

13 is useful about those records, right?  That is a certain amount

14 of burden on the plaintiff in this scenario to collect, review

15 and produce the documents; and then a certain amount of burden

16 on the defendants to sift through the documents that have been

17 produced and figure out what's relevant, what's not, whether we

18 care, whatever.

19            The challenge here is that this request shifts the

20 entire burden of that document review and analysis to the

21 plaintiff, which would be otherwise a shared burden to some

22 extent because these negatives can't be produced in a

23 traditional sense.  The idea that the defendants would have to

24 do some work to match up the negatives to the photographs is not

25 totally dissimilar to the idea that you have to sift through all

1 of the documents to figure out the factual story and what's

2 relevant to the presentation of the defense case.

3          So while I'm not particularly convinced, Mr. Salta,

4 that this is an expert issue because I think Mr. Troy's point is

5 right.  I mean, the expert's job is not going to be to match up

6 the photographs with the book.  There is something to be said

7 for somehow this being a shared enterprise to figure out what's

8 what in terms of this collection.  It is burdensome, but it's

9 also, as I said earlier in the context of some of these other

10 interrogatories, highly relevant.

11          So I'm not sure exactly what to do about that one,

12 either.  You folks have presented a lot of vexing questions here

13 today, which is fine.

14          But I think, Mr. Troy, that, you know, the idea that

15 you just shift this entire burden to them to do that matching

16 process is a bit inconsistent with the way discovery typically

17 works.

18          At the same time, Mr. Salta, it doesn't exactly work

19 to shift the burden all to the defendants because, again, in the

20 ordinary course of reviewing and producing documents, there is

21 some burden on the producing party as well to sift through

22 what's relevant and what isn't.

23          MR. SALTA:  We'll produce -- way back we were thinking

24 of going to a location where Mr. Troy would have a light table

25 and take pictures of the negatives, and we'll produce -- we'll

1  produce all the documents.

2          THE COURT:  Is that helpful to you, Mr. Troy?  I mean,

3  all --

4          (Cross-talk)

5          MR. TROY:  Your Honor, as you pointed out very aptly

6  in the last hearing, it makes me a witness, and seeing that I am

7  the attorney, I don't think that that should be done.  I think

8  the compromise position would be -- hold on.

9          THE COURT:  You don't have to be the person to do it.

10  I mean, you can --

11          (Cross-talk)

12          MR. TROY:  Who am I going to get to do it?

13          THE COURT:  I don't know.  Your expert maybe.

14          MR. TROY:  Right.  But now I'm flying my expert in

15  from California.  It's going to cost an absolute fortune.  This

16  is a small client.  This -- you know, this litigation has been

17  hugely expensive given all of the circles that we have been

18  chasing around and, you know, I know that the Court in one sense

19  is sympathetic to it, but in the same sense, you know, we have

20  to litigate.  I have --

21          THE COURT:  Hold on.  Let's just be clear about that.

22  The case is big and sprawling because you've made it big and

23  sprawling.  Now, there is good reason for that, and we've talked

24  about the efficiencies of that, but the case that was filed by

25  plaintiff was fairly narrow.  You, in counterclaiming in the way

1  that you have, which is your right, have made it big and

2  sprawling.  So you can't really do that, ask for more expansive

3  discovery and then complain about it being burdensome.  That --

4  you can't have it both ways.

5          MR. TROY:  I understand that, but, you know, as -- in

6  our papers plaintiff sued over 200 images when, in fact, the

7  plaintiff had taken down 25 images.

8          THE COURT:  Okay.

9          (Cross-talk)

10         MR. TROY:  So --

11         THE COURT:  -- about 50 images instead of 2,000

12 images, and I imagine Mr. Salta and Mr. Gallagher would be happy

13 to review the 50.

14         MR. TROY:  May I suggest as a potential to at least

15 get the factual part of this done is is that a third party is

16 engaged as a duplication company because there are -- you know,

17 companies that duplicate negatives or will make positives out of

18 them because part of the problem, as Your Honor saw in what we

19 filed was the Deposit Copies, much of it is just a black dot.  I

20 mean, you don't know what's even on the page.  Is to have a

21 third-party company make images of, you know, the negatives that

22 plaintiff claims and that plaintiff will represent these are the

23 negatives that I received, you know, in 1992 because that's

24 really what we are talking about here, and that way we would

25 both have a complete set of copies of what should have been in

1  the original Deposit Copy.  Had the Deposit Copy been done

2  correctly, as opposed to these black images, we wouldn't be in

3  this issue.

4  　　　THE COURT:  Okay.  And the point of having it be a

5  third party is -- I assume the next part of that was to share

6  the cost of it?

7  　　　MR. TROY:  Well, I'm trying to -- Your Honor, I'm

8  trying to think on my feet, even though I'm sitting down, of a

9  way to kind of break through this logjam without going to the

10 need of experts then later at some point in time inspect the

11 negatives to verify the negatives are, in fact, as old as they

12 are because I'm hoping, as I said earlier, to avoid that

13 assuming that we prevail on our motion for summary judgment.

14 　　　THE COURT:  And if you were able to get the third-

15 party vendor to make these copies, which would then be subject

16 to the protective order, of course, as well --

17 　　　MR. TROY:  Of course.

18 　　　THE COURT:  -- you would then be able to review them

19 yourself to determine which of those images or negatives or

20 reproductions match up with the items in the book and the

21 collection?  In other words, Interrogatory No. 6 and number

22 seven?

23 　　　MR. TROY:  My staff, I mean, the royal "you."

24 Although, my staff isn't lined up out the back door here.

25 　　　THE COURT:  No, I understand.  But "you" meaning

1 defendants collectively.

2        MR. TROY:  Yes.  And I think that plaintiff would also

3 benefit from that as well.

4        THE COURT:  All right.  Mr. Gallagher seems not happy

5 with that suggestion.

6        MR. SALTA:  You know what, I defer -- I always defer

7 to the client.  Mr. Gallagher says that he can answer these

8 questions, so maybe we can do it without -- we can wait until

9 after January 31st if an expert is necessary.

10        THE COURT:  Okay.  Fine.  That's the answer, then.  I

11 mean, they are going to be verified interrogatory responses,

12 which means that they will be under the penalty of perjury.

13 It's not a best guess.  It is going to be a process to review

14 all of that stuff.

15        Okay.  Well, again, this is partly -- and we had a

16 very lengthy proceeding here today in part because we basically

17 met-and-conferred our way through half of these objections and

18 such, but hopefully that was productive for everybody.

19        And there may be other specific interrogatories that I

20 haven't addressed in detail, but to the extent that my guidance

21 on all of these issues doesn't answer your questions for those,

22 you should talk to each other about it and figure out if there

23 is a workable solution.  I am all in favor of practical

24 solutions to these problems and, you know, this case does

25 present a number of unusual circumstances, and you're working

1  through how to get these questions answered, and you understand

2  that those are going to need to be answered in one way, shape or

3  form.

4           So look, again, we have just under two months here

5  based on the current schedule to complete discovery.  Aside from

6  all of this paper, written discovery, which is not nearly

7  complete, we have the deposition of Mr. Steel, which we've

8  talked about.  What other depositions are you anticipating?  I'm

9  guessing Mr. Gallagher.  I should just stop guessing.  My

10  guessing has not been very good today.

11          Mr. Troy, who do you anticipate deposing in this case?

12          MR. TROY:  We have one other deposition scheduled,

13  which is of Mr. Kaylo (ph), who was the attorney that

14  represented Mr. Hom/Healite in the transaction where

15  Mr. Gallagher purchased what he purchased.  I haven't argued

16  with Mr. Salta today about what he says is in that agreement

17  because that's not what we are here for today.  But anyhow, he

18  is scheduled to be deposed.  Originally, it was supposed to be

19  Friday, but they rescheduled it; "they" meaning him and his

20  attorney for next Friday in New York in his attorney's offices.

21          THE COURT:  Okay.

22          MR. TROY:  At the moment, I have no other depositions

23  scheduled.  I was actually hoping because we thought that the

24  more efficient vehicle were -- was written discovery in this

25  case, to not take Mr. Gallagher's deposition, and as

1  Mr. Gallagher probably remembers all too well is that in the

2  2000 case we took a huge number of depositions, including of

3  him; and I was just trying to avoid that, not that I don't mind

4  sitting in the same room with him, but I just don't think that

5  it's a productive use seeing -- of our time given some of the

6  issues that need to be identified, which is what we've been

7  discussing for the last couple of hours.

8          THE COURT:  Okay.  So fair enough.  And that,

9  obviously, will depend on the outcome of your negotiations about

10 the scope of the written responses, and maybe the plaintiff's

11 side would prefer to just have Mr. Gallagher sit for a

12 deposition.  Who knows?  But I understand your position.

13         So other than Mr. Steel and Mr. Kaylo, you don't -- at

14 the present moment don't anticipate any further depositions?

15         MR. TROY:  Correct, Your Honor.

16         THE COURT:  Okay.  And look, discovery is still

17 ongoing, so that's without prejudice to your being able to

18 change your mind as you learn more.  And of course, I understand

19 that you may need to depose Mr. Gallagher for all the reasons we

20 talked about today.

21         Mr. Salta, depositions?

22         MR. SALTA:  At this point, I don't think we have

23 anything in mind or scheduled.

24         THE COURT:  Okay.  You are not going to need to depose

25 Ms. Kelly or a corporate representative of True Pilates Boston?

 1                MR. SALTA:  I will confirm with Mr. Knull.  To be

 2    honest, I don't anticipate it, no.

 3                THE COURT:  Okay.  All right.  Well, that simplifies

 4    things a little bit.

 5                And can you talk about a briefing schedule with Judge

 6    Karas or are you supposed to report back to him after discovery

 7    is complete?

 8                MR. TROY:  First, I think we are supposed to report

 9    back to him after today.

10                THE COURT:  Okay.  After today?

11                MR. TROY:  After -- Judge Karas was adamant that we

12    needed to be nice to you.

13                THE COURT:  Nice to me?

14                MR. TROY:  Yes.  To which I said, I'm always nice, but

15    the -- we're supposed to report back to him about today, and

16    then at the close of factual discovery at the end of January, we

17    are supposed to -- he didn't really want us to resubmit, I think

18    he just wanted us to reengage the pre-motion process.

19                THE COURT:  Okay.  That's fine.  And you've already

20    written those letters, but it may be that the way this is

21    happening now, your -- whatever motions for summary judgment you

22    intend to file can be comprehensive instead of partial.  But I'm

23    not -- or maybe there is -- you know what?  I'm not going to

24    wade into that.  We can talk about that another time.

25                MR. TROY:  If you don't mind my asking, Your Honor, if

1  I could just -- on that point, and I have tried to be really,

2  really careful in my papers; it's partial only insofar as our

3  first counterclaim which are for damages related to the unlawful

4  takedowns, but we're not at that stage until I demonstrate that

5  there is no copyright.  So, you know, under the copyright

6  statute Section 512(f), the -- we are entitled to damages and

7  attorneys' fees and costs should we prevail.  So that's the only

8  little piece that would be left over should we prevail on our

9  motion for summary judgment.  So that's the reason why I've

10 termed it "partial" because there is that one little piece

11 that's left.

12           THE COURT:  Okay.  Okay.  The short answer is that you

13 don't have a briefing schedule, so that's fine.

14           MR. TROY:  Sorry.

15           THE COURT:  No, that's okay.  It's all helpful to

16 understand all of that.  So I'm just trying to think about when

17 we should next get together, in part so I set some parameters

18 and get you to make sure you get everything together and

19 finalized sufficiently in advance of January 31st so that if we

20 have disputes that need to be adjudicated, you can present those

21 to me.  I'm not sure -- you know, at that point I'm not sure

22 whether we need to have another lengthy conference to address

23 all of these things because we've now worked through all of the

24 guidance that I think I can give you with respect to the scope

25 of the responses and what needs to be done at that point and may

1  be something that I can simply address on papers, and it may

2  make sense to submit slightly more comprehensive papers if there

3  are disputes outstanding.  I'm hopeful that there won't be, but

4  who knows?

5          So I want to give you a little bit of time to digest

6  everything we have talked about today.  Meet and confer with

7  each other, and then potentially propound revised versions of

8  document demand -- I mean, RFAs if necessary, which probably

9  will be necessary, interrogatories, depending on how you choose

10 to resolve that.  I think it makes sense to try to bring that

11 all to a head by the end of next week, the 16th, because that

12 way if you get any revised written discovery served by the 16th,

13 you will have until mid January to respond, and then you can

14 provide me with an update about that shortly before the

15 scheduled completion of discovery.  So I think that that's how

16 we'll go about it.  Any revised discovery demands in whatever

17 form, whether that's RFAs, interrogatories, document demands, to

18 be served by next Friday, the 16th.  I will put the response

19 date at the 17th of January given the holiday that weekend.  You

20 will have a chance to review and digest whatever comes of that,

21 and I will ask you to provide updates to me by the 23rd of

22 January.

23          So I mean, as we sit here, there are no outstanding

24 issues in discovery from the plaintiff's perspective, right,

25 Mr. Salta?

1         MR. SALTA:  Not that I know of, Judge.

2         THE COURT:  Okay.  So we will make it this way:  The

3    23rd of January either side can submit a letter regarding

4    ongoing affirmative discovery disputes that have not been

5    resolved by the supplemental responses to supplemental demands

6    or amended responses to amended demands.  Those should come in

7    on the 23rd; responses to those letters by the 26th.  I realize

8    that that puts us up against the January 31st deadline.  I don't

9    really see any way of shortening that.  I mean, we could require

10   your supplemental or amended response demands to be served by

11   this Friday and shorten the whole thing by a week, but

12   realistically, I'd rather give you a little bit more time to

13   work through the issues and see how many of them you can resolve

14   on your own.  I also am going to be in the midst of a whole

15   series of trials in January, so it's not as though getting your

16   letters on the week of the 17th is going to make a material

17   difference to me.  My hope is that giving you this extra week in

18   December to meet and confer will make a material difference to

19   you in terms of the scope of what you are able to address and

20   work out independently.  So letters on the 23rd, responses on

21   the 26th.  And we will take stock of where we are at that point

22   and whether we need a new conference.

23         I'll just point out that January 31st deadline is

24   Judge Karas's deadline.  I think I mentioned this at our first

25   conference.  Judge Karas's scheduling order, even though this

 1  matter is referred for general pretrial supervision, his

 2  scheduling order requires that if you need an extension of the

 3  discovery deadline, you have to request it from him, which

 4  you've done before.  So I will also give Judge Karas a report on

 5  today's conference and let him know what to expect.  I'm

 6  optimistic that we will be able to get everything done by the

 7  31st.  If there needed to be a brief extension of that deadline,

 8  you would have to ask Judge Karas for it, but I'm reasonably

 9  optimistic that he would be willing to grant that as well if it

10  comes to that.

11           Okay.  Is there anything further that we should

12  address today, then, from the plaintiff's perspective,

13  Mr. Salta?

14           MR. SALTA:  No, I don't think so, Judge.

15           THE COURT:  Mr. Troy?

16           MR. TROY:  The only question I have outstanding as

17  between Your Honor and Judge Karas because he had asked us to

18  report back to him after today.

19           THE COURT:  Yes.

20           MR. TROY:  And one of the outstanding issues, but I

21  did not want to bother the Court, was the discussion we had

22  about the expert discovery going later, and you know, you said

23  you are going to update Judge Karas as to what transpired today

24  and then should we not?  So --

25           THE COURT:  No.  If he told you to update him, you

1  should update him.  I'm just going to send him an email.  If he

2  asked you to send him a letter to update him on what happened

3  today, you should do that.  I mean, I think the upshot of what

4  happened today -- and you can describe it however you want -- is

5  that I attempted to give you guidance on a number of these

6  outstanding issues, and you are going to meet and confer about

7  them over the next ten days and revise discovery requests as

8  appropriate all with an eye towards getting discovery done by

9  January 31st as planned.  But I think where we left things in

10 terms of the experts is you have discussed it with Judge Karas,

11 the possibility of doing discovery post -- expert discovery post

12 briefing, and nothing that has been said today, despite all the

13 back-and-forth, has really changed that.

14        I think Mr. Gallagher is prepared to answer certain

15 things that took us away from the potential for expert discovery

16 in connection with 6 and 7.  You know, again, my understanding

17 of the scope of what the expert would be doing is that that --

18 some of that could be deferred until afterwards.  I think a lot

19 of the issues that are outstanding are really fact questions

20 that are not going to be answered by the expert Mr. Troy is

21 proposing to bring in.

22        So, you know, I know we have gone around and around on

23 that a bit today, but nothing that you have said or that we have

24 discussed makes me think that we should really reframe or rework

25 the schedule so that we do expert discovery before January 31st.

1  That said, you are going to meet and confer over the next ten

2  days, and if you wind up having a joint proposal to do things

3  differently because you conclude -- I'm not thinking this is

4  likely since you have very different views on this -- but there

5  may be creative ways of trying to bridge the divide.  I think if

6  you decided that you wanted to try to do expert discovery, you

7  could report that to me and/or to Judge Karas at some point

8  between now and the 16th or between now and the holidays and

9  the discovery schedule could be adjusted.

10         Again, I think this is a situation where if the

11 parties wind up having -- the discovery here is just a bit

12 unusual for a variety of reasons because of the scope of the

13 number of issues in dispute or the number of works that are

14 potentially at play here, and also the fact that the defendants

15 are trying to shoehorn as much of this as possible into written

16 discovery, in part to obviate the need for depositions.  So, you

17 know, there are a lot of different things going on here that are

18 not typical of a discovery schedule that we all use for every

19 case, and so this may be one where if the parties have a

20 creative proposal, especially if it's a joint proposal, for how

21 to do things a little bit differently, I certainly would be

22 amenable to adopting that, and I would certainly be willing to

23 recommend that to Judge Karas, assuming that I think it's a good

24 idea.  And you know, I think if there is something like that in

25 the offing, you will let me know.  Okay?

 1         I'm not going to set another conference date, not
 2  because I wouldn't like to see you all again, but we will hold
 3  off on that until we see whether that's necessary.  I'll report
 4  back to you with an order of some sort after I get those letters
 5  the week of the 23rd, and if we need to have a further
 6  conference, we will get that on the calendar.

 7         Just in case that that means we wind up not having any
 8  further conferences in the case, let me just mention that to the
 9  extent you all think there is any way that I could help you
10  resolve this case through a settlement conference, you should
11  let me know.  You don't have to go back to Judge Karas to ask
12  for a further order of reference for settlement.  I don't really
13  see that being likely here because of the particular issues
14  involved and all of the things we have been talking about, but I
15  always want to mention that before I bid you farewell.

16         Again, don't tell me you want a settlement conference
17  just because you want me to think you are reasonable people.  I
18  already think you are reasonable people.  I just offer that in
19  case you think there would be any meaningful opportunity to try
20  to get things resolved or even get some things resolved.  We
21  could have a settlement conference to work through those issues.
22  So talk about that as well.

23         Again, I'm not sure I see the path forward for a
24  settlement conference at this point, but that offer remains
25  open, you know, throughout, whether it's before briefing, while

1 the briefing is pending, or if the case survives summary

2 judgment in some form before trial.  Different cases can settle

3 at different times, and the parties' views on settlement will

4 evolve as the issues are narrowed and brought into clearer

5 focus.  So keep that in mind, and keep me posted if that's

6 something you would like to consider.

7            All right.  So with that said, we will stand adjourned

8 for today.  Thank you for bearing with us through all of this.

9 I think we accomplished a lot.  I hope we did.  I wish you all a

10 safe, happy and healthy holiday season.  Happy new year.  And if

11 we don't see each other again, I will look forward to seeing you

12 on other cases in the future.  Take care, everybody.

13            MR. SALTA:  Thank you, Judge.

14            MR. TROY:  Thank you, Your Honor.

15            THE COURT:  Thank you.

16                          -o0o-

17

18

19

20

21

22

23

24

25